VASQUEZ v. STATE
2025 OK CR 1
Case Number: D-2021-1249
Decided: 01/30/2025
DANIEL RAUL SANTIAGO VASQUEZ, Appellant v. THE STATE OF OKLAHOMA, Appellee
Cite as: 2025 OK CR 1, __ __

 

 

OPINION

LUMPKIN, PRESIDING JUDGE:

¶1 Appellant, Daniel Raul Santiago Vasquez, was tried by jury and convicted in the District Court of McClain County, Case No. CF-2018-166, of: Counts 1 and 2, First Degree Murder, in violation of 21 O.S.Supp.2012, § 701.721 O.S.2011, § 116121 O.S.2011, § 425

I. VASQUEZ WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE.

II. THE TRIAL COURT VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS IN DENYING THE DEFENSE MOTION TO EXCUSE POTENTIAL JUROR NO. 26 (M.H.) FOR CAUSE.

III. THE TRIAL COURT VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS IN DENYING THE DEFENSE MOTION TO EXCUSE POTENTIAL JUROR NO. 27 (J.W.) FOR CAUSE.

IV. IMPROPER ADMISSION OF GRUESOME PHOTOGRAPHS RENDERED THE TRIAL AND PENALTY PHASE FUNDAMENTALLY UNFAIR IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.

V. THE TRIAL COURT VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS BY DENYING FUNDS TO THE DEFENSE SO THAT OUT OF STATE DEFENSE WITNESSES COULD TESTIFY LIVE AT THE SENTENCING PHASE.

VI. THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION TO INSTRUCT THE JURY ON RESIDUAL DOUBT AS A MITIGATING FACTOR.

VII. THE TRIAL COURT ERRED IN DENYING THE DEFENSE MOTION TO INSTRUCT THE JURY ON EXCULPATORY STATEMENTS OF FACT MADE BY VASQUEZ.

VIII. VASQUEZ WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.

IX. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT BEYOND A REASONABLE DOUBT THE "HEINOUS, ATROCIOUS, OR CRUEL" AGGRAVATING CIRCUMSTANCE AS TO THE UNBORN CHILD IN COUNT II.

X. THE ACCUMULATION OF ERRORS RESULTED IN A FUNDAMENTALLY UNFAIR TRIAL.

XI. THE DEATH SENTENCES WERE IMPOSED UNDER THE INFLUENCE OF PASSION, PREJUDICE AND WERE OTHERWISE ARBITRARY IN VIOLATION OF THE CONSTITUTIONAL RIGHTS OF VASQUEZ UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

¶2 After thorough consideration of these propositions and the entire record before us on appeal including the original record, transcripts, and briefs of the parties, we have determined that under the law and the evidence, Appellant is not entitled to relief.

FACTS

¶3 On April 28, 2018, Shaliyah Toombs was twenty-three and lived with her roommate, Cecelia Morales, in the Ventura Greens Apartments at the intersection of Southwest 70th Street and South Walker in Oklahoma City. Toombs had two daughters, ages two and one, and she was thirty-one to thirty-two weeks pregnant with her third child, a boy whom she named H. Toombs. Her mother, Twyla Taylor, had custody of the girls due to Toombs being in an abusive relationship, as well as her use of methamphetamine (meth). In the early evening of April 28th, Toombs, Taylor, and the girls enjoyed a visit to a local park. Taylor dropped Toombs off at her apartment at around 8:00 p.m.

¶4 On April 29, 2018, around 11:00 a.m., Taylor awakened and looked at her cell phone. She saw several texts from Toombs which were sent in the early morning hours. One of those, sent at 4:50 a.m., stated, "They're going to kill me, Mom. Help me." Taylor immediately called Toombs' cell but received no answer. She also repeatedly texted Toombs but received no response. Taylor's sister, Tierni Taylor, went to Toombs' apartment that evening, knocked on the door but no one answered. She walked around to the back patio, and determined that the patio door was unlocked, so she stepped inside. The lights were on but sensing something was wrong, Tierni Taylor stepped back out of the apartment, called police and reported Toombs as missing.

¶5 On May 2, 2018, law enforcement found Toombs' body in the back seat floorboard of a black Dodge Ram pickup parked on the shoulder of northbound I-35 south of the Riverwind Casino. Early that morning, Capt. Chad Hillis, Chickasaw Nation Lighthorse Police, stopped at the Love's Travel Stop on Hwy. 9 across from the Riverwind Casino. As he stood in the checkout line, he saw an unkempt man, later identified as Appellant, wandering around aimlessly. The man accosted Hillis and asked to speak with him outside. Once outside, Appellant calmly told Hillis there was a "blue

¶6 The events leading to Toombs' and her unborn baby's murders began approximately one month before the discovery of Toombs' body. Toombs and her roommate, Morales,

¶7 About two weeks before the murders, Morales met Stacy Harjo and her boyfriend, Joshua Finkbeiner. Morales later introduced Toombs to Harjo, who provided the two women with meth in exchange for house cleaning and babysitting services

¶8 On April 28, 2018, one day before Toombs' disappearance, Morales and Toombs had an argument. As a result, Morales decided to act like she was moving out and contacted Harjo to come pick her up. Harjo arrived in the Jeep and the two drove to a car lot in Norman where they met Finkbeiner who was in his black Dodge pickup. Harjo and Morales drove the Jeep to a casino and Finkbeiner drove to the casino in his truck. After spending a short time at the casino, the three got into Finkbeiner's truck

¶9 After Morales arrived at Mate's house, she received text messages and phone calls from Harjo. She knew Harjo and Finkbeiner planned to go to Toombs' apartment to search for the backpack. During one phone call, she heard the voices of Toombs, Harjo, Finkbeiner, and Appellant. She was surprised to hear Appellant's voice. Morales advised in this conversation that she did not take Appellant's wallet. She told Appellant that Toombs took it. Appellant became angry and she heard Appellant ask Toombs if it was true that she took his wallet and Toombs denied that she took it. Morales ended the call.

¶10 Based upon texts between Morales and Harjo, Morales understood Harjo and Finkbeiner planned to scare Toombs into giving them the backpack. After this phone call, Morales passed out and did not awaken until the afternoon of April 29. Mate took her to meet with Harjo and Finkbeiner, who smashed Morales' phone. Thereafter, Morales went to Arkansas with Harjo and Finkbeiner. Morales willingly went with them, and later learned that Toombs was missing. She messaged Appellant and asked him if he had seen Toombs. Appellant responded angrily that he had not, and he planned on leaving Oklahoma. Morales admitted at trial she hoped her truthful testimony would assist her in her own legal problems.

¶11 Also, in the late evening of April 28 and the early morning hours of April 29, another meth using friend of Toombs, named Kenneth Smith, was at Toombs' apartment. Appellant showed up driving a maroon Buick and came inside where the three of them smoked meth using Smith's pipe. Appellant played a song and stated, "If I was to kill somebody, this is the song I'd be playing." A man named Jason or Jay-so arrived at the apartment and he and Toombs left to run an errand. Smith also left, but Toombs asked him to leave his meth pipe there and he agreed to do so. Appellant remained at the apartment alone.

¶12 Later Smith returned to Toombs' apartment and received several cryptic messages from Toombs' phone beginning at 4:50 a.m. The first one read, "They gonna kill me." Smith texted back asking where Toombs was. He received a text, "Do you really want [i]n this?" Smith responded that he only wanted his meth pipe back. The next text from Toombs' phone at 5:30 a.m. read, "She did this to herself and nowbgotyou in it just forget n erwse[.] Go get our pipr. Her apartment is unlocked[.] Did she steal it[?]" Smith did not believe Toombs sent the messages, other than the first one at 4:50 a.m. He also knew that only he, Toombs, and Appellant knew he left his meth pipe at Toombs' apartment. Smith also knew that earlier in the week Toombs was stressed out about a backpack Harjo accused her of stealing.

¶13 Appellant did not testify but gave four interviews to police (State's Exhibits 173, 174, 176, 177). The story he told regarding the murders of Toombs and her baby was tortuous and incredible. His initial interview occurred on May 2, 2018, at the McClain County Sheriff's Office. OSBI Agent David Gatlin and Deputy David Tompkins conducted the first interview, which was admitted into evidence as State's Exhibit 173. Review of this exhibit shows Appellant was calm, articulate and keen to tell police his story. He first let the officers know that he was a former Marine and began to relate the events of the previous three days by telling the officers that Toombs called him late on Saturday night, April 28, 2018, and told him Morales had moved out. Appellant knew Toombs did not like to be alone, so he went to her apartment, arriving about 1:00 a.m. on April 29, 2018. There were two men (later identified as Kenneth Smith and Jason or Jay-so) there with Toombs and they were all doing meth. Appellant indicated he also used meth, but only as a mechanism by which to gain the trust of people he wanted to help. Toombs, Smith, and Jason were talking about a backpack, and wondering what it contained. Appellant learned the backpack had been stolen. Toombs and Jason left the apartment together to run an errand and Smith left also, leaving Appellant alone for a while in the apartment. Toombs returned alone and at about 2:00 a.m., a man named Josh (Finkbeiner) and a woman named Stacy (Harjo) arrived at the apartment. They were extremely angry about the missing backpack, which belonged to Finkbeiner and contained a hard drive belonging to his employer which he needed for work. If Finkbeiner did not get the hard drive back, he could lose his lucrative job.

¶14 Appellant told Gatlin and Tompkins he looked at Finkbeiner and "knew" Toombs was going to die. Harjo brandished a handgun, a .380 caliber semi-automatic. Harjo and Finkbeiner told Appellant he could leave but he stayed. Appellant stated he went "semi-Stockholm" in an effort to defuse the situation. He helped Finkbeiner search Toombs' apartment for the backpack while Harjo kept Toombs downstairs at gunpoint. After failing to find the backpack or its contents, Harjo and Finkbeiner forced Appellant and Toombs into a black Dodge Ram pickup. They drove to Midwest City to a residence associated with someone named "Bones," another person Harjo and Finkbeiner thought might have the backpack. Appellant admitted he sent threatening texts to Bones, trying to convince Harjo and Finkbeiner he was on their side. Appellant stated that Harjo and Finkbeiner were sadists and kidnaped Morales and tortured her to use as a sex slave. Upon arrival at Bones' cousin's house, Harjo and Finkbeiner left Appellant alone, but he made no effort to leave. Having no success finding the backpack at this location, Harjo and Finkbeiner decided to drive to the "farm." They offered to drop Appellant off at Thunderbird Casino, but he declined the offer. As they drove to the "farm" Harjo called Morales on the way after learning from Appellant that Morales stole his wallet. It is this phone call where Morales disclosed that Toombs stole Appellant's wallet, causing Appellant to "act a little bit angry."

¶15 Appellant told the officers he thought the "farm" belonged to friends of Harjo and was a community of "sadists." Although Appellant was never clear about exactly where the "farm" was, he was sure it was south and east of Purcell. Harjo and Finkbeiner got out of the truck at the "farm" and decided to kill Toombs in the back seat of the truck. Morales was not at the "farm." When they got back in the truck, Harjo was driving, Appellant was in the front passenger seat and Finkbeiner was in the back seat with Toombs. Harjo drove around and at about 6:00 a.m., Finkbeiner began choking Toombs for about 3.5-4.5 minutes. Appellant stated Finkbeiner initially used a "dummy choke" on Toombs, which he said was the long way to strangle someone because it does not fully close the airway. Later in this interview, Appellant stated Finkbeiner began choking Toombs at 6:15 a.m. and continued choking her until about 6:40 a.m., crushing her trachea. At that time Harjo and Finkbeiner made him choke Toombs. Appellant said Toombs was already dead at that time since he could feel no pulse and her bowels released. Appellant pretended to choke Toombs because Harjo and Finkbeiner thought Toombs was still alive due to sounds emanating from her lungs. Appellant also stated that rigor mortis had begun to set in Toombs' body at that time.

¶16 According to Appellant, Harjo and Finkbeiner demanded at gunpoint that Appellant give them information regarding his family, and they made him confess to killing Toombs on video. Appellant never disclosed what he said on that video. Harjo and Finkbeiner gave him the keys and $60.00, then exited the truck and walked off. They told him to get rid of the body and the truck. Appellant stated he drove around and tried to outthink Harjo and Finkbeiner and that he wanted to preserve evidence.

¶17 Throughout this interview, Appellant continually rambled off point in order to tell Gatlin and Tompkins about his Marine experiences, intelligence, and coolness under pressure. He never displayed any fear or anxiety about his family, nor did he seek to communicate with his family to satisfy himself they were all right or to warn them they might be in danger. Appellant was also emphatic that his meth use did not affect his cognition.

¶18 In later interviews, Appellant told officers he was forced at gunpoint to take possession of the truck and Toombs' body as a test to see if he could be trusted not to immediately contact police. If he contacted police, Harjo and Finkbeiner would kill his children. Appellant also explained that he drove around with Toombs' body because he did not trust Oklahoma law enforcement and he was not making coherent decisions due to the stress of the situation. This was in contrast to his previous explanation that he was trying to outthink Harjo and Finkbeiner and preserve evidence. Appellant also claimed Finkbeiner killed Toombs quickly in about 2.5 minutes and that Appellant did not strangle her until forty minutes later. Appellant stated at this time, Toombs' body was cold and rigor mortis was setting in.

¶19 In his interviews, Appellant explained he did not dispose of Toombs' body because he wanted Toombs' mother to be able to bury her daughter and he wanted to preserve bruising evidence on Toombs' neck made by Finkbeiner's large hands. Appellant further explained he drove to numerous places which used security cameras in order to create a timeline of his activities. However, at no time did Appellant contact law enforcement, telling the interviewing officers that he feared for the safety of Morales and his family if he did so. Appellant also drove his own vehicle, a maroon Buick, during this time, leaving the Dodge truck containing Toombs' body in the parking lot of the Drexel Place apartments. After Trooper Mike Mohler pulled Appellant over on April 30, 2018, while he was driving the Buick, Appellant had to leave it parked at a Carl's Jr. parking lot. During this traffic stop, recorded via the trooper's dashcam, Appellant was calm and matter-of-factly told Mohler he had no license or other identification because his wallet was stolen. Appellant made no mention of the traumatic events he claimed to have endured the previous night or his belief that his family was in danger.

¶20 Appellant claimed Finkbeiner left his phone with Appellant in order for he and Harjo to give him instructions and so it would appear they were trying to help, presumably in any search for Toombs. Appellant stated he deleted items off of Finkbeiner's phone and then sold it to an individual named Brandon Irvin. Appellant also stated he destroyed the SIM card in his own phone.

¶21 In March 2021, Appellant and an inmate named Kody Gonzales were cell mates in the McClain County jail. During this time, Appellant told Gonzales that when Toombs was strangled by Finkbeiner, Appellant held her legs because she was kicking. Appellant also told Gonzales that he tried to portray himself as a hostage after Toombs' death in order to avoid getting into trouble.

¶22 The State presented evidence regarding Toombs' prenatal care and the development of Baby H. Dr. Stephanie Bryant, maternal/fetal medicine physician, testified she reviewed Toombs' ultrasound, taken March 20, 2018. She determined: the baby exhibited no abnormalities in his anatomy; his heartrate was normal; he was positioned head down (best for delivery); he was moving, indicating normal development; amniotic fluid and placenta were normal for his gestational age; and the umbilical cord was normal. Although Bryant noted the umbilical cord was wrapped around Baby H's neck, she indicated this was a normal finding. She estimated Baby H's weight to be average for his gestational age. Due to Baby H's development and gestational age of twenty-six weeks and four days, Bryant moved up Toombs' due date six weeks to June 22, 2018. Bryant testified that she did not believe Toombs' meth use would have affected Baby H's survivability. Midwife Lori Edwards concurred in this belief, testifying in cases where the mother uses meth, the most common effect upon the baby is withdrawal symptoms after birth, rather than complications before birth.

¶23 Bryant estimated Baby H would have been thirty-one to thirty-two weeks along on the date Toombs died, and if Toombs had gone into labor at that time, his survival rate would have been almost 100%. Upon Toombs' death, there would have been a short amount of time in which to save Baby H since he would no longer have been receiving blood and oxygen from Toombs. During this process, Baby H would have experienced similar symptoms to those of an adult whose oxygen supply was cut off. Eventually, he would have lost consciousness and his heart would have stopped beating.

¶24 Dr. Inas Yacoub performed the autopsy on Toombs' body. Her body was in a state of decomposition, with bloating and skin slippage. Yacoub observed redness in both eyes which could have been petechiae, evidence of strangulation that merged with blood vessel breakdown due to decomposition. There was a patterned red-brown mark under the left side of Toombs' jaw, which was the only significant finding in Toombs' neck area. Her trachea, neck and hyoid bone were not fractured. Baby H had no congenital abnormalities and was well-developed and viable. He could have survived had he been delivered. Yacoub noted the umbilical cord wrapped around his neck but testified that is generally no cause for concern as the cord can be unwrapped during delivery or immediately thereafter. Yacoub opined the manner of death of both Toombs and Baby H was homicide by manual strangulation.

¶25 The State presented evidence in the form of surveillance footage and cell phone location data. Gatlin obtained footage from the Goldsby Casino which verified Morales' statement that she went there voluntarily with Harjo and Finkbeiner on the night of April 28, 2018. The agent also confirmed portions of Appellant's statements, i.e., that Appellant went to Toombs' apartment, the route Harjo and Finkbeiner took the night of the murders, Appellant's trips to various casinos, and that Appellant was pulled over by a highway patrol trooper and left his car at the Carl's Jr. parking lot.

¶26 Toombs' phone records generally confirmed the route Appellant described, with the last outgoing activity from her phone in the area around Lake Thunderbird State Park at approximately 5:30 a.m. on April 29, 2018. Toombs' phone continued to receive incoming texts and calls, which apparently went unanswered. Additionally, Tombs' messages to her mother and to Smith that "they" were going to kill her occurred only two minutes after the Harjo phone call to Morales regarding Appellant's stolen wallet.

¶27 Records from Appellant's cell phone showed his phone in the same area as Toombs' apartment in the early morning hours of April 29, 2018, and then in areas of south Oklahoma City on April 30. His cell phone activity changed on May 1, 2018, with the phone appearing to be off but still receiving "no location information," which could indicate that its SIM card was removed.

¶28 A Cellbrite extraction of Appellant's cell phone revealed text messages sent by Appellant to someone named Crystal at about 11:00 p.m. April 28, 2018, where he indicated he was "[p]issed the fuck off [.]" Further explaining, "[l]ike choke a mother fucker the fuck out pissed." Additionally, the extraction showed that it was Appellant who called Toombs on April 29, 2018, at about 1:00 a.m. and not Toombs who called him as Appellant repeatedly told law enforcement in his statements. Moreover, this call to Toombs was deleted. The extraction demonstrated that Appellant communicated with numerous individuals via Facebook Messenger, but never revealed the ordeal he claimed to have endured, never sought help from law enforcement or voiced concern over the safety of his family members or himself.

¶29 After Harjo and Finkbeiner were arrested in Arkansas on May 5, 2018, their phones were examined.

What's up, I'm Daniel. This dead bitch over here, [Appellant points at Toombs' body] [camera moves to show Toombs' body and then moves back to Appellant] that's LeLe, or Shaliyah. She shouldn't have stole my ID, but she did. She's a dumb fuck. Rest in peace darlin'. I told you I'd fucking get you back, didn't I, bitch?

JURY SELECTION AND COMPOSITION

¶30 In Propositions II and III, Appellant contends the trial court committed reversible error in failing to grant his In ¶30 In Propositions II and III, Appellant contends the trial court committed reversible error in failing to grant his motion to remove prospective jurors MH (Proposition II) and JW (Proposition III) for cause, compelling him to remove them from the panel by peremptory challenge. Because of this, he continues, he was forced to keep two jurors he claims were "unacceptable." Appellant preserved this issue for appellate review by first using his peremptory challenges to strike the panelists he unsuccessfully challenged for cause, then futilely requesting additional peremptory challenges, and finally, by making a record regarding the two "unacceptable" prospective jurors he would have excused via peremptory challenges had he not been compelled to use them on the panelists the trial court refused to excuse for cause. See Nolen v. State, 2021 OK CR 5485 P.3d 8292021 OK CR 52012 OK CR 7274 P.3d 161

¶31 Appellant argues that during voir dire, both MH and JW evinced their inability to follow their oath as jurors to consider all three sentencing options, particularly their inability to consider the sentence of life with the possibility of parole. "Due process of law requires that a prospective juror be willing to consider all the penalties provided by law and not be irrevocably committed to a particular punishment before the trial begins." Sanchez v. State, 2009 OK CR 31223 P.3d 9802007 OK CR 29164 P.3d 208

The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " [Wainwright v.] Witt, 469 U.S. [412], at 424, 105 S.Ct. [844], at 852, [83 L.Ed. 2d 841 (1985) ]. See also Gray v. Mississippi, 481 U.S. 648, 658, 107 S.Ct. 2045, 2051, 95 L. Ed. 2d 622 (1987). Inherent in this determination is that the potential juror has been fully informed of the law and his or her responsibilities under the law and oath of a juror. This standard does not require a juror's bias be proved with unmistakable clarity; neither must the juror express an intention to vote against the death penalty automatically. Witt, 469 U.S. at 425, 105 S.Ct. at 852. "Deference must be paid to the trial judge who sees and hears the jurors". Id., 469 U.S. at 425, 105 S.Ct. at 853. See also Uttecht v. Brown, 551 U.S. 1, 127 S.Ct. 2218, 2224, 167 L. Ed. 2d 1014 (2007) ("deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.").

This Court has adhered to the principles set forth in Witt. See Glossip v. State, 2007 OK CR 12157 P.3d 1432001 OK CR 922 P.3d 7022007 OK CR 122001 OK CR 92001 OK CR 9

This Court has recognized that ambivalent responses from prospective jurors during voir dire regarding punishments are common in capital trials, as are jurors' willingness to consider all three punishments upon receiving instruction by the trial court that they must do so. Davison v. State, 2020 OK CR 22478 P.3d 4622018 OK CR 20423 P.3d 617

¶32 Appellant claims MH and JW were biased against life with the possibility of parole given their responses during questioning. His focus is on specific responses to support his argument they could not fulfill their duties as jurors. The State answers that the entirety of these panelists' responses shows their willingness to follow their oaths, follow the law given to them by the trial court, and to consider all three punishments.

¶33 Both panelists had no moral opposition to the death penalty. Upon learning there were three possible punishments for a conviction of first degree murder, each stated he or she was willing to consider all three statutory punishments. During individual questioning, both panelists gave somewhat equivocal responses regarding their ability to consider life with parole. MH was open about her pro-life beliefs and indicated as a mother, it would be hard to consider life with the possibility of parole for the murder of an unborn baby. However, upon further questioning by the trial court, she indicated she could put aside her personal beliefs, follow the law and give meaningful consideration to all three punishments. JW voiced his willingness to consider all three punishments, although life with parole would be hard for him. He indicated initially to defense counsel that once he convicted Appellant of first degree murder, he would not want to know any more about him. Upon further questioning by defense counsel, JW stated he would listen to mitigation evidence. The prosecutor questioned JW further about his willingness to consider all three punishments, and JW stated after hearing all the evidence, he would consider all three punishments. Finally, the trial court questioned JW and the juror agreed that he could weigh the aggravating and mitigating circumstances, as well as consider all three punishments, and impose the punishment warranted by the law and evidence.

¶34 The record demonstrates these prospective jurors realized any punishment decision would occur after presentation of all the evidence in the case, after finding guilt beyond a reasonable doubt and after weighing the aggravating and mitigating evidence. At the conclusion of questioning by the lawyers and the trial court, these prospective jurors were willing to meaningfully consider the three available punishment options and follow the law as instructed by the trial court. Review of the entirety of their responses in conjunction with deference owed to the trial court's ruling, we find their responses do not show an impermissible bias towards the death penalty or an unwillingness to consider all three punishment options. Accordingly, the trial court did not abuse its discretion in denying Appellant's for cause challenges to these prospective jurors. Propositions II and III are denied.

FIRST STAGE ISSUES

¶35 In Proposition I, Appellant maintains the trial court erred in excluding a statement made by co-defendant Harjo to an Arkansas deputy sheriff allegedly naming Finkbeiner as the only perpetrator of Toombs' murder. Appellant argues the statement was "third-party perpetrator evidence," the exclusion of which denied his right to present a defense. We review this claim for an abuse of discretion. Simpson v. State, 2010 OK CR 6230 P.3d 8882012 OK CR 7

¶36 The defense listed multiple video recordings of police interviews with Finkbeiner and Harjo on its Witness and Exhibit list filed July 29, 2021. This filing prompted the State to file a motion in limine seeking to prohibit the defense from admitting any out of court statements made by either Finkbeiner or Harjo for the following reasons: they were inadmissible hearsay; even if offered for a non-hearsay purpose, admission of incomplete statements by the co-defendants would prejudice the State because it could not call either of the witnesses to testify due to their pending prosecutions; and admission of incomplete interviews would confuse the jury.

¶37 The defense response to the State's motion set out: Finkbeiner and Harjo were facing separate trials for the murders of Toombs and her baby, so they could not be compelled to testify in Appellant's trial, rendering them unavailable for purposes of 12 O.S.Supp.2014, § 280412 O.S.Supp.2014, § 2804

¶38 At trial, the defense offered Bittle's written statement regarding what Harjo told him (Court's Exhibit 7)

¶39 A defendant has the right to present a defense, but he must comply with rules of procedure and evidence which are designed to assure fairness and reliability in criminal proceedings. Crane v. Kentucky, 476 U.S. 683, 689-90 (1986); Simpson, 2010 OK CR 62011 OK CR 29268 P.3d 86

¶40 Alternative suspect evidence is admissible if it meets the following criteria:

[T]he evidence offered must connect such other person with the fact; that is, some overt act on the part of another towards the commission of the crime itself. There must be evidence of acts or circumstances that tend clearly to point to another, rather than to the defendant, as the guilty party, there must be such proof of connection with it, such a train of facts or circumstances, as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts, disconnected, and outside of the crime itself, cannot be separately proved for such a purpose, and there must be evidence of acts or circumstances that tend clearly to point to another, rather than the accused.

Gore v. State, 2005 OK CR 14119 P.3d 12682005 OK CR 14

¶41 Appellant primarily argues Harjo's statement was admissible pursuant to 12 O.S. 2021, § 2804

A statement which was at the time of its making contrary to the declarant's pecuniary or proprietary interest, or which tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, and which a reasonable person in the declarant's position would not have made unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. A statement or confession offered against the accused in a criminal case, made by a codefendant or other individual implicating both the codefendant or other individual and the accused, is not within this exception[.]

While the trial court made no formal finding that Harjo was unavailable as a witness, given that she was charged in a separate case with Toombs' and Baby H's murders, she could not be compelled by either the State or Appellant to give testimony in this case in violation of her Fifth Amendment right against self-incrimination. See Pavatt v. State, 2007 OK CR 19159 P.3d 272

¶42 Analysis of Harjo's statement as reported by Bittle on Court's Exhibit 7 shows that it fails to meet the requirements of Section 2804(B)(3). While her statement did expose her to criminal liability, nothing in the statement established that a reasonable person in Harjo's position would not have made the statement unless she believed it to be true. In the exhibit statement, Harjo clearly minimized her participation in the events leading to the deaths of Toombs and Baby H. She stated she tried to get Finkbeiner to refrain from going to Toombs' apartment and to quit hurting Toombs, but Finkbeiner would not listen to her. She denied she had a gun. Thus, Harjo painted herself as an unwilling, marginal participant in the murders. Nothing in this statement demonstrates Harjo believed her statements were true. What the exhibit statement does show is Harjo's calculated attempt to gain sympathy with Bittle and perhaps reduce her culpability in the crimes.

¶43 Furthermore, the exhibit statement lacks corroboration clearly indicating its trustworthiness and is contradicted by other evidence adduced in the case. Morales testified that while she was with Harjo and Finkbeiner immediately prior to their trip to Toombs' apartment, the pair voiced their intention of going there. Morales also testified Harjo obtained a gun prior to going to Toombs' apartment and she gave no testimony that Harjo tried to talk Finkbeiner out of going there. Appellant's own statement contradicts Harjo's assertion in the exhibit statement that he was with her and Finkbeiner when they went to Toombs' apartment. Appellant stated he arrived alone at Toombs' apartment before Harjo and Finkbeiner. He also stated Harjo had a gun during the events at Toombs' apartment. Appellant emphasized in his statements to Gatlin how Harjo was the dominant personality in the relationship between her and Finkbeiner and how Harjo directed Finkbeiner's actions.

¶44 Harjo's description in the exhibit statement about how Toombs died is also contradicted by Appellant's statement and by the testimony of Dr. Inas Yacoub. Harjo's exhibit statement indicates Finkbeiner killed Toombs on the ground outside the vehicle and that Finkbeiner broke her neck. Appellant stated Finkbeiner strangled Toombs in the back seat of the truck, killed her and then Harjo told Appellant to finish Toombs off because she thought Toombs was still alive. Thereafter, Appellant stated he got in the back seat and strangled the already deceased Toombs. Yacoub testified Toombs did not have a broken neck, trachea, or hyoid bone.

¶45 Based upon this record, the trial court did not abuse its discretion in disallowing admission of Harjo's statements contained in Court's Exhibit 7. The statements therein were uncorroborated and unreliable and nothing in the exhibit shows that Harjo believed the statements therein were true. Cf. Pavatt, 2007 OK CR 19

¶46 Appellant argues the evidence, even if not admissible pursuant to our rules of evidence, should have been admissible pursuant to his due process rights under the Fourteenth Amendment. In order to establish such a violation, Appellant must show:

. . . a denial of fundamental fairness. . . . It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial. Evidence is material if its suppression might have affected the outcome. In other words, material evidence is that which is exculpatory--evidence that if admitted would create reasonable doubt that did not exist without the evidence.

Primeaux v. State, 2004 OK CR 1688 P.3d 893

¶47 By Appellant's own statements, he ignored three opportunities to depart from Harjo's and Finkbeiner's company prior to the murders, one at Toombs' apartment, one at Bones' cousin's house and one as they were driving to the "farm." Appellant also stated: he knew Finkbeiner and Harjo were going to kill Toombs; he actively assisted Finkbeiner in looking for the hard drive in Toombs' apartment; he sent intimidating messages to Bones, then erased them; he sent texts to Toombs' phone after her death; he thought Toombs was a thief and a liar; and he was angry to find out that Toombs stole his wallet. Additionally, Appellant's versions of how Toombs died changed. Appellant first told police Finkbeiner strangled Toombs for three and a half to four and a half minutes, then re-positioned his hands and crushed her trachea. Later, he stated Finkbeiner strangled Toombs for two and a half minutes, and in his third interview with police, he stated Finkbeiner strangled Toombs twice, the first time for twenty to thirty minutes and the second time for about four minutes. Appellant also changed his stories about why he drove around with Toombs' body, at first stating he wanted to outsmart Harjo and Finkbeiner and preserve evidence but later stating he did not trust Oklahoma law enforcement and the stress of his situation prevented him from making coherent, rational decisions. A particularly damning piece of evidence against Appellant was the video where he smugly made a peace sign, pointed at Toombs' dead body next to him and after admitting he killed her, said, "I told you I'd fucking get you back, didn't I bitch?"

¶48 Finally, Gonzales, Appellant's cell mate in the McClain County jail, testified that Appellant told him that when Toombs was strangled by Finkbeiner, Appellant held her legs because she was kicking. Appellant also told Gonzales that he portrayed himself as a hostage after Toombs' death in order to avoid getting into trouble.

¶49 Appellant's actions after Toombs' and Baby H's murders also support the jury's finding of guilt. Although Appellant stated Harjo and Finkbeiner threatened his family, the evidence presented showed that Appellant never made any attempt to warn family members of this danger or to try to get help from authorities. He never asked law enforcement to contact his family or take any steps to ensure they were safe, including when he was in police custody. Other witnesses' testimony also provides support for Appellant's guilt. Morales testified she went willingly with Harjo and Finkbeiner and was never in danger from them. She also testified Harjo had a gun, the loss of Appellant's wallet was very important to him and that he became angry when she told him over the phone that Toombs stole it. Smith testified that he left his meth pipe at Toombs' apartment and only he, Toombs and Appellant knew it was there after he left. Thus, Smith testified he believed the texts he received from Toombs' phone at about 5:30 a.m. on April 29, 2018, stating "she did this to herself" and telling him Toombs' apartment was unlocked so he could get his meth pipe were made by Appellant and not Toombs. Yacoub testified that Toombs did not suffer from a broken neck, crushed trachea or broken hyoid bone.

¶50 As clearly shown, the State presented significant evidence of Appellant's guilt. Harjo's statements contained on Court's Exhibit 7 would not have created a reasonable doubt that did not exist before. Therefore, Appellant's due process rights were not violated by the trial court's ruling.

¶51 The record shows the trial court did not abuse its discretion in denying admission of Harjo's statement contained in Court's Exhibit 7 and the denial did not violate Appellant's due process rights. Proposition I is denied.

¶52 In Proposition IV, Appellant challenges the admission of certain crime scene and autopsy photographs during guilt stage proceedings. Where Appellant lodged an objection to the photographs, our review is for an abuse of discretion. Martinez v. State, 2016 OK CR 3371 P.3d 11002012 OK CR 7

¶53 Where Appellant lodged no objection to the admission of photographs, our review is for plain error. Hogan v. State, 2006 OK CR 19139 P.3d 907

¶54 Photographs are admissible to corroborate witnesses' testimony. See Warner v. State, 2006 OK CR 40144 P.3d 8382007 OK CR 27164 P.3d 10891998 OK CR 66973 P.2d 27012 O.S.2021, § 24032010 OK CR 14235 P.3d 640

¶55 Appellant first complains of the admission of State's Exhibit 36, a photograph of Toombs' body after it was removed from the backseat of the truck and placed on a gurney atop a body bag. He did not object at trial to this exhibit. He argues State's Exhibit 36 was cumulative to other photographs and showed Toombs' body as "staged" by authorities in preparation for transport. He is mistaken. Both Yacoub and OSBI Agent Miles Keene, who took the photographs, testified Toombs' body was in a state of decomposition, likely exacerbated, per Keene's testimony, by the Appellant's storage of her body in a closed vehicle for three days in the warm April temperatures. Yacoub also testified Toombs' body appeared bloated, a natural function of decomposition which can alter the appearance of the body, and which in Toombs' case resulted in the use of her fingerprints to identify her remains. While there is no doubt State's Exhibit 36 is a disturbing photograph, it corroborates witnesses' testimony, and it shows the result of Appellant's actions in driving around for days with Toombs' body in the truck. We find the probative value of this photograph was not substantially outweighed by any prejudicial effect. The trial court committed no error in admitting this exhibit.

¶56 Appellant next complains of State's Exhibits 130, 135, 136-37 and 141, all photographs taken at autopsy. He objected to their admission. Regarding State's Exhibit 130, Appellant objected that the exhibit was more prejudicial than probative, and that it was unnecessary to Yacoub's testimony. The State responded that it was one of a series of photographs chosen to show the overall condition of Toombs' body, as well as close-ups of her upper and lower body areas, stating her body looked the way it did because of Appellant. The trial court overruled the defense objection.

¶57 Yacoub testified that this exhibit documented Toombs' bloated face, as well as her protruding tongue, which Yacoub explained was a function of decomposition. The medical examiner also testified the exhibit showed a small metal decoration on the lower left side of Toombs' lip, which matched her driver's license photograph. The photograph of the driver's license found in Toombs' back pocket was admitted as State's Exhibit 133. When State's Exhibit 133 is compared to State's Exhibit 130, it is impossible to see that the young attractive woman depicted on State's Exhibit 133 is the same woman depicted on State's Exhibit 130. Thus, the complained of exhibit was extremely corroborative of Yacoub's testimony regarding the difficulty in identifying Toombs' remains. Moreover, the exhibit showed the result of Appellant's actions in driving around with Toombs' body. There was no abuse of discretion in the admission of State's Exhibit 130.

¶58 Next on Appellant's list of improperly admitted exhibits is State's Exhibit 135. The defense objected on the basis that the picture was too "inflammatory." The trial court overruled the objection. This exhibit is disturbing, but Yacoub testified the exhibit shows the redness she observed in Toombs' right eye, which was significant because it could have been evidence of petechiae caused by strangulation. Yacoub could not definitively state that the redness was petechiae, individual small red dots in the eye, due to the advanced decomposition of Toombs' body which caused the individual dots to merge. This exhibit again corroborates Yacoub's testimony, and the effects caused by Appellant's actions in driving around with Toombs' body for three days. The trial court did not abuse its discretion in admitting State's Exhibit 135.

¶59 Appellant next argues, as he did at trial, that State's Exhibits 136 and 137 were inflammatory. He specifically argued State's Exhibit 137 was not relevant because it showed a tattoo on Toombs' left shoulder and Yacoub testified Toombs was identified through her fingerprints. The trial court overruled the objections. While Yacoub did testify regarding use of Toombs' fingerprints to identify her remains, the tattoo shown on her body served to confirm her identity as the same woman whose remains were found in the back seat of the truck Appellant drove. Additionally, Yacoub testified that during decomposition, the upper layer of skin blisters and slips, leaving a lighter colored layer beneath. This phenomenon is depicted on both exhibits and shows the extensive decomposition of Toombs body. Moreover, Toombs was an African-American woman, so it was important to explain why portions of her skin appeared white and confirm for the jury that these photographs depicted Toombs, the same woman discovered in the back seat of Appellant's truck. There was no abuse of discretion in the trial court's admission of these exhibits.

¶60 Lastly, Appellant takes issue with the admission State's Exhibit 141. This exhibit shows Baby H after Yacoub removed him from his mother's womb. Appellant objected to this exhibit, arguing it only served to inflame the jury and that some jurors might be distressed by this photograph. The State responded that none of the jurors seemed to have reacted to any of the evidence at this point in trial and the State bore the burden to prove that Toombs' unborn child was viable at the time of her death. The trial court overruled the defense objection. There can be no doubt that this exhibit is distressing. Yacoub testified Baby H would have survived had he been born on April 29, 2018. She further testified Baby H appeared to be perfectly formed and his only abnormalities were his skin slippage and discoloration due to decomposition. State's Exhibit 141 corroborates her testimony about Baby H's condition, state of decomposition and once again shows the effects of Appellant's actions in driving Toombs' around for three days in the truck.

¶61 Additionally, after publication of State's exhibit 141 to the jury, the trial court excused the jurors and made a record regarding any effects of the evidence of the autopsy exhibits on the jury. The trial court stated prior to the publication of State's Exhibit 141, that it "observed no physical distress from any of the jurors." After publication of this exhibit, the trial court noted that although Jurors No. 3 and No.11 appeared tearful, they were not sobbing, nor did they indicate they could not continue. The trial court further acknowledged that the State had "been very judicious in the displaying or publication of these images[,]" such that they were not displayed for long periods of time but "only long enough to allow the medical examiner to explain what she is seeing[.]"

¶62 Based upon the record, we find no abuse of discretion in the trial court's admission of these exhibits. They corroborated various witnesses' testimony, they illustrated the result of Appellant's actions in driving around with Toombs' body for three days, they called into question Appellant's statements that he was trying to preserve evidence for prosecution purposes, they were relevant to proof of the elements of malice murder, they were relevant to proof of the aggravating circumstances alleged by the State, and their probative value was not substantially outweighed by any prejudicial effect. Proposition IV is denied.

¶63 Appellant claims in Proposition VII that the trial court erred in denying his request for the "exculpatory statement of fact" jury instruction. "The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court." Eizember, 2007 OK CR 29

¶64 The exculpatory statement of fact instruction, Instruction No. 9-15, OUJI-CR (2d), provides as follows:

An exculpatory statement is defined as a statement by the defendant that tends to clear a defendant from alleged guilt, or a statement that tends to justify or excuse his/her actions or presence.

Where the State introduces in connection with a confession or admission of a defendant an exculpatory statement which, if true, would entitle him/her to an acquittal, he/she must be acquitted unless such exculpatory statement has been disproved or shown to be false by other evidence in the case. The falsity of an exculpatory statement may be shown by circumstantial as well as by direct evidence.

A statement is exculpatory within the meaning of this instruction only if it concerns a tangible, affirmative, factual matter capable of specific disproof. A statement is not exculpatory within the meaning of this instruction if it merely restates the defendant's contention of innocence.

As set forth in Splawn v. State, 2020 OK CR 20477 P.3d 394

¶65 In this case, Appellant was charged with first degree murder in concert with Finkbeiner and Harjo. The jury received instruction that Appellant could be convicted even if he did not actually kill Toombs, if he knowingly and with criminal intent aided and abetted Finkbeiner and Harjo in the commission of her murder. Instruction No. 2-5, OUJI-CR (2d). As fully set out in Proposition I, there was ample evidence which supported Appellant's guilt, either by actually strangling Toombs, or by aiding and abetting Finkbeiner and Harjo in her killing.

¶66 Regarding Appellant's claim that he was under duress when Toombs was killed, duress is not a defense to first degree murder. See Long v. State, 2003 OK CR 1474 P.3d 1052020 OK CR 13467 P.3d 693

¶67 Based upon the record, the trial court did not abuse its discretion in refusing to give Appellant's requested exculpatory statement jury instruction. Proposition VII is denied.

SECOND STAGE ISSUES

¶68 In Proposition V, Appellant contends the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights by denying his request for funds to bring out-of-state mitigation witnesses to trial to present live, in-person testimony. He argues some technical problems with the presentation of mitigation witnesses by videoconferencing violated the Eighth Amendment and the failure of the trial court to authorize funds to physically bring the witnesses to McClain County for his trial violated his right to compulsory process under the Sixth Amendment. Review of this claim is for an abuse of discretion, as set out in Proposition IV. See Rule 34(C), Rules of District Courts of Oklahoma, Title 12, Ch. 2 App. (2025) (providing District Court judges "broad discretion regarding the use of videoconferencing."); Hamilton v. State, 2020 OK CR 11466 P.3d 58720 O.S.2021, § 130

¶69 Rule 34(C) provides as follows regarding use of videoconferencing technology or the equivalent thereof, in the district court at trial:

This Rule is intended to provide a judge presiding over any matter in District Court with broad discretion regarding the use of videoconferencing. The judge may consider one or more of the following criteria in determining whether to permit the use of videoconferencing technology in a particular case:

(1) Whether any undue surprise or prejudice would result;

(2) Whether the proponent of the use of videoconferencing technology has been unable, after diligent effort, to procure the physical presence of a witness;

(3) The convenience of the parties and the proposed witness, and the cost of producing the witness in person in relation to the importance of the offered testimony;

(4) Whether the procedure would allow for full and effective cross-examination, especially where such cross-examination would involve documents or other exhibits;

(5) The importance of the witness being personally present in the courtroom where the dignity, solemnity, and decorum of the surroundings will impress upon the witness the duty to testify truthfully;

(6) Whether a physical liberty or other fundamental interest is at stake in the proceeding;

(7) Whether the court is satisfied that it can sufficiently know and control the proceedings at the remote location so as to effectively extend the courtroom to such location;

(8) Whether the participation of an individual from a remote location presents such person in a diminished or distorted sense such that it negatively reflects upon such individual to persons present in the courtroom;

(9) Whether the use of videoconferencing diminishes or detracts from the dignity, solemnity, and formality of the proceeding such as to undermine integrity, fairness, and effectiveness;

(10) Whether the person proposed to appear by videoconferencing presents a significant security risk to transport and present personally in the courtroom;

(11) Waivers and stipulations of the parties offered and agreed upon and approved by the court, including waiver of any requirement set forth in this Rule, or stipulation to any different or modified procedure; and

(12) Such other factors as the court may, in each individual case, determine to be relevant.

¶70 Appellant filed a motion on June 21, 2021, seeking funds with which to bring fifteen out-of-state witnesses to trial to testify in mitigation during the penalty phase. On June 25, 2021, the trial court issued a detailed order denying Appellant's request, finding the use of videoconferencing technology to be appropriate in this case. The trial court specifically found: Covid-19 restrictions and related issues made the safety and reliability of travel uncertain for the multiple witnesses; personal appearance was unnecessary in order to ensure truthful testimony from these mitigation witnesses; the videoconferencing technology would allow full and effective examination by both parties and allow the jurors to have full view of the witnesses and attorneys; the presentation of remote testimony was not foreseen to reflect negatively on Appellant, since the trial court planned to instruct the jury how it was to consider such testimony; although Appellant's life and liberty were at stake in these proceedings, this factor must be weighed along with the others set forth in Rule 34; and the trial court would ensure the preservation of the fairness, effectiveness, and integrity of the proceedings.

¶71 Appellant sought rehearing of his motion, arguing Oklahoma lacked Covid-19 infections and that the previous version of Rule 34 excluded use of videoconferencing in jury trials. Appellant also argued video testimony could never have the same effect as live testimony and the internet connection in the McClain County Courthouse was unreliable. The trial court's ruling remained the same and Appellant sought a writ of mandamus in this Court which was denied on August 5, 2021. Vasquez v. Hon. Leah Edwards, MA-2021-795 (August 5, 2021) (unpublished).

¶72 On August 10, 2021, the first day of trial, Appellant announced he was not ready and sought a continuance because he could not have his witnesses appear personally in the penalty phase. The trial court denied his request. Ultimately, seventeen witnesses testified in support of mitigating circumstances, seven by way of videoconferencing. One of these, Aimee Feather-Hall, lived locally but could not testify in person because she was positive for Covid-19. Having this witness's testimony by videoconference was a benefit to Appellant, as otherwise she would have been unable to testify. The State also presented three witnesses via videoconferencing during its case in chief, Lt. Jay Basket and Morales due to Covid-19 exposure and Dr. Bryant because she was in Hawaii.

¶73 During individual voir dire, defense counsel specifically inquired of several potential jurors whether the fact that a witness testified via video would adversely affect his or her assessment of a witness's credibility and attention to the witness's testimony. All potential jurors responded that it would not.

¶74 During the testimony of five defense mitigation witnesses, M.S., Bruce Henson, Tiffany McFarlane, Stanville Coleman, and Scott Grimmer, some minor technical difficulties occurred. These were: the video feed briefly malfunctioned; or the video picked up some background noise which affected the volume of the video. The issues were quickly resolved, and the majority of these witnesses' testimony was presented without issue. The trial court instructed the jury to consider the videoconference testimony the same way it would consider live testimony. We presume the jury followed its instruction. Head v. State, 2006 OK CR 44146 P.3d 1141

¶75 The defense made a record of these difficulties at the conclusion of the evidence, maintaining they negatively impacted the jury. The State disagreed that any difficulties with videoconferencing had a negative impact on the jury. The trial court made a record of its observations of the proceedings and use of videoconferencing as follows:

With regard to asking witnesses to slow down and speak up, I believe Mr. White [prosecutor] has been asked to slow down several times during this trial. Live witnesses were asked to slow down and speak up repeatedly. I certainly have not kept count, but would venture a guess that the times live witnesses were asked to slow down and speak up is commensurate with the times that the videoconferencing witnesses were asked to do the same; so there was no difference with regard to that aspect.

In the couple of witnesses where there was freezing of the video momentarily, which did again catch up quickly--and I will say that the Court does note that the audio was never delayed or unavailable. It was---once the testimony began, it was only the video that on a couple of witnesses was delayed or froze a couple of times.

The Court did, at those times, check its download speed just to make sure that the issue was not within this courtroom and the courthouse, and it was not. The upload and download speeds provided by our internet was more than sufficient to effectively--effectively have videoconferencing in real time.

With regard to Coleman's inability to identify the defendant, there was no allegation--there were no allegations that Mr. Coleman's description of Daniel Vasquez and the person that he testified about was not one and the same Daniel Vasquez who was seated in court. The Court finds if he failed to identify the defendant because he didn't properly know how to use the platform, it was not prejudicial in any way; as through both the direct, cross, and redirect, that it was a given--if you will, it was implied that he was speaking of the one and the same defendant in this courtroom.

With regard to Aimee Feather, she effectively testified. Maybe she was called at a different time than the preference would have been, but the Court has witnessed that a few times during this case. The State's rebuttal witness could only be here at a certain time. I don't know this, but I would assume the State would have preferred to call that rebuttal witness in complete rebuttal at the end of the testimony. However, because of certain things, we have called witnesses out of time; that has happened. It has---it has not been a problem up to this point.

The Court further wants to note two things about COVID: Number one, both the State and the defendant have had witnesses who have either been exposed or diagnosed with COVID who have been allowed to testify in this court effectively. Had videoconferencing not been utilized and not [been] provided for by statute and the court rules, those witnesses would not have been allowed to have been here and testify in this trial. That, ladies and gentlemen, would have been detrimental to this defendant.

And, lastly, the Court is reviewing the COVID numbers for McClain County. COVID has surged--I believe we can all agree, and if anyone does not agree, feel free to make a record on that at the conclusion--during the pendency of this trial. COVID was high when we summoned our jurors, and we have gone through great lengths to keep them safe and, up to this point, have done so. During the last four weeks of this trial, the COVID numbers in McClain County have surged. McClain County has more COVID than any of the surrounding counties. During the pendency of this trial, we have learned that there are no available hospital beds nor ICU beds for COVID patients. Therefore, because of the times, because of the emergency circumstances of this trial, the Court finds good cause to use the videoconferencing testimony as it was utilized in this particular matter.

Review of the record supports the trial court's findings regarding the videoconferencing. "One of the cardinal principles of the Supreme Court's Eighth Amendment jurisprudence is that a capital murder defendant must be given the opportunity to present relevant mitigating evidence for consideration by the jury." Tryon, 2018 OK CR 20

¶76 In this case, Appellant faced no limitations on the presentation of mitigation evidence, only on the manner of its presentation. As shown by the record, seventeen witnesses testified on Appellant's behalf during the penalty phase and only seven of these by videoconference. The trial court found the technical problems that occurred during the presentation of some of the witnesses' video testimony were minor and did not affect the jury's ability to consider the evidence. Nothing in the record shows Appellant's Constitutional right to present mitigation evidence was impaired and we find no Eighth Amendment violation.

¶77 Appellant also asserts his Sixth Amendment right to compulsory process was impaired by the trial court's ruling regarding presentation of live testimony in the penalty phase. He appears to take the position that compulsory process means a defendant has an absolute right to in-person live testimony from a defense witness. He is mistaken.

¶78 "[T]he Compulsory Process Clause guarantees a defendant the right to call witnesses 'in his favor.'" Melendez-Diaz v. Massachusetts, 557 U.S. 305, 313 (2009) (quoting United States Constitution, Amendment Six). See also Harris v. State, 2019 OK CR 22

(1) that the court prevented him from obtaining or presenting evidence; (2) that the court's action was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose; and (3) that the excluded evidence "would have been relevant and material, and ... vital to the defense."

Harris, 2019 OK CR 222019 OK CR 22

¶79 The record reveals Appellant was not prevented from obtaining or presenting his mitigation evidence. He makes no claim that any ruling of the trial court prohibited him from having as many mitigation witnesses testify as he wanted. As fully set forth, the trial court's reasoning behind its denial of Appellant's request for funds with which to provide in-person live testimony of mitigation witnesses was rational and thorough. The trial court considered the gravity of Appellant's case as well as the dangers and restrictions flowing from the existence of the global Covid-19 pandemic in reaching its well-reasoned decision. Based upon this record, Appellant's Sixth, Eighth and Fourteenth Amendment rights were not violated. The trial court did not abuse its discretion in applying Rule 34 to deny Appellant's request for funds with which to bring out-of-state witnesses to trial to present live in-person testimony. Proposition V is denied.

¶80 In Appellant's sixth proposition, he avers the trial court erred in refusing to give the jury his proffered instruction on residual doubt during the penalty phase of his trial. Specifically, he argues the instruction is warranted under the Eighth and Fourteenth Amendments to the United States Constitution as well as due to the circumstances of his case: that the defense presented evidence that Appellant passed a polygraph test showing no deception in his denial that he killed Toombs; and that the jury's deliberations during the guilt phase of trial were lengthy.2007 OK CR 29

¶81 In Lockett v. Ohio, 438 U.S. 586, 604 (1978), the Court held as follows regarding the jury's consideration of mitigation evidence in capital cases: "[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer. . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Id. (emphasis in original). This holding, however,

in no way mandates reconsideration by capital juries, in the sentencing phase, of their residual doubts over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's character, record, or a circumstance of the offense. This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.

Franklin v. Lynaugh, 487 U.S. 164, 174 (1988) (internal citation and quotations omitted).

¶82 Our cases follow this reasoning and hold "there is no constitutional right to a jury instruction making residual doubt a mitigating circumstance as it is not relevant to the defendant's character, record, or any circumstance of the offense." Bernay v. State, 1999 OK CR 46989 P.2d 9982011 OK CR 292006 OK CR 192001 OK CR 3437 P.3d 9082010 OK CR 14

¶83 In this case, however, the trial court allowed evidence of Appellant's polygraph results, which showed no deception when he answered "no" when asked if he killed Toombs, to be admitted during the penalty phase.

¶84 Our review of the jury instructions given show that they permitted the jury to freely consider the polygraph evidence and any doubt it may have raised. The trial court listed the polygraph evidence as a mitigating circumstance, among numerous others, which the jury could consider as evidence which might reduce Appellant's culpability or which might lead jurors to decide not to impose the death penalty, and instructed the jurors they could find other mitigating circumstances exist and consider those as well. The jury's consideration of the polygraph evidence and all of the other mitigation evidence was not restricted. Cf. Posey, 2024 OK CR 10

¶85 The trial court did not abuse its discretion in denying Appellant's requested residual doubt jury instruction and there was no violation of his Eighth and Fourteenth Amendment rights. Proposition VI is denied.

¶86 Appellant alleges in Proposition IX that the State presented insufficient evidence of the "especially heinous, atrocious or cruel" aggravator with regard to Baby H's death. He argues the jury's finding of the existence of this aggravator violated his constitutional right to a fair trial.

When the sufficiency of the evidence of an aggravating circumstance is challenged on direct appeal, we review the record to determine whether the evidence, considered in the light most favorable to the State, was sufficient for a rational trier of fact to find the existence of the aggravating circumstance beyond a reasonable doubt.

Posey, 2024 OK CR 10

¶87 "To prove that a murder is especially heinous, atrocious or cruel, the State must show: (1) the victim's death was preceded by torture or serious physical abuse; and (2) that the facts and circumstances of the case establish that the murder was heinous, atrocious, or cruel." Bench v. State, 2018 OK CR 31431 P.3d 9292018 OK CR 31

¶88 The record reveals the State presented no evidence that Baby H endured torture or conscious physical suffering before he died. Bryan testified there would have been a very short amount of time in which to save Baby H after Toombs' death. She further testified, in response to defense counsel's question whether an unborn baby falls asleep when its blood supply and oxygen is cut off, "if you or I had our oxygen or blood supply cut off, we would pass out. . . and. . . eventually our heart would stop as well. . . so it similarly happens in babies." She also testified, ". . . if there was no oxygen or blood supply from Mom, the baby's heart would stop beating." Yacoub testified she found no evidence upon her examination of Baby H, ". . . that the kid was distressed for some time in Mom's womb and then died."

¶89 The lack of evidence that Baby H suffered due to infliction of great physical anguish or endured conscious physical suffering prior to his death renders this aggravator invalid. Cf. Cudjo v. State, 1996 OK CR 43925 P.2d 895

¶90 Appellant is not entitled to relief on this basis. Having found the especially heinous, atrocious or cruel aggravator invalid concerning Baby H's murder, we now evaluate the effect of the invalidated aggravator on Appellant's death sentence and "consider whether the remaining aggravating circumstances outweigh the mitigating circumstances and whether the weight of the improper aggravator is harmless." Posey, 2024 OK CR 10

¶91 Where a sentencing factor is invalidated, a death sentence may be rendered unconstitutional "by reason of its [the invalidated sentencing factor] adding an improper element to the aggravation scale in the weighing process unless one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." Brown v. Sanders, 546 U.S. 212, 220 (2006) (footnote omitted). Impermissible slanting in the weighing process occurs and leads to constitutional error, "only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." Id., at 221. In this case, there was no impermissible slanting or constitutional error due to the invalid especially heinous, atrocious or cruel aggravator regarding Count 2 because the continuing threat aggravator and great risk of death to more than one person aggravator allowed the jury to give aggravating weight to the same facts and circumstances used to support the invalid aggravator, i.e., the death of Baby H in his mother's womb due to Toombs' murder by strangulation.

¶92 As there is no constitutional violation or slanted sentence from the consideration of the invalid aggravator, we undertake an independent re-weighing of the aggravating and mitigating evidence to decide the validity of the death sentence. Tryon, 2018 OK CR 202018 OK CR 20

¶93 In this case, there are two remaining aggravating circumstances: the great risk of death to more than one person aggravator; and the continuing threat aggravator. The evidence supporting these two aggravators was significant and they were proven beyond a reasonable doubt. This Court has generally upheld the great risk of death to more than one person aggravator in cases where the "defendant either killed two or more people contemporaneously with the intent to kill all the victims or contemporaneously injured or killed one or more bystanders in the line of fire." Jackson v. State, 2006 OK CR 45146 P.3d 1149

¶94 The evidence supporting the continuing threat aggravator was also significant. In Gilson v. State, 2000 OK CR 148 P.3d 883

To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future. In evaluating whether there is a probability that the defendant will commit acts of violence which will constitute a continuing threat to society, we have held that evidence of the callousness of the murder for which the defendant was convicted can be considered as supporting evidence, as well as prior criminal history and the facts of the murder for which the defendant was convicted. (internal quotations omitted).

In this case, the State presented the following evidence supporting the callousness of the two murders as part of its proof of the continuing threat aggravator: Appellant made the deliberate decision to remain in the company of two people whom he believed were dangerous and intended to harm Toombs; Appellant murdered a woman who he claimed was his friend and her unborn baby over the theft of $14.00 and his identification; he made a chilling video, smugly claiming responsibility for her death; after Toombs' death, Appellant covered her body in the back floorboard of the truck with clothing and other objects; and then drove around for three days to stores and casinos as she and Baby H decayed. There can be no doubt of the callousness and brutality of Appellant's actions and that these actions supported the continuing threat aggravator. See Bench, 2018 OK CR 31

¶95 In addition to the callousness of Toombs' and Baby H's murders, the evidence showed Appellant, while in jail, made repeated rage-filled phone calls where he threatened to escape and kill other people, including his attorney. He also threatened to assault one of his attorneys. Taken as a whole, the callous, brutal and pitiless nature of the killings of Toombs and Baby H, coupled with Appellant's post-offense rage-filled behavior, evince a clear threat to society and a probability that this threat would continue to exist in the future. In the light most favorable to the State, we find that any rational trier of fact could have found the continuing threat aggravator beyond a reasonable doubt.

¶96 Appellant presented a wealth of mitigation evidence from friends, family and fellow Marines covering almost every part of his life. This evidence included accounts concerning Appellant's childhood and his physically abusive father, who also abused drugs and alcohol and left the family when Appellant was five years old. Appellant's mother had a volatile relationship with her second husband who singled out Appellant for unequal treatment. After their divorce, the family struggled with poverty and Appellant had to help his mother with her cleaning job. Appellant was a loving caregiver to his younger brother who suffered from a chronic condition. He graduated from high school and witnesses described Appellant as a peacekeeper and protective friend, despite the rough, drug and violence filled neighborhood where he grew up.

¶97 Appellant presented evidence of his military service. He enlisted in the Marines and served two tours in Iraq. While there, he spent more than a year in Fallujah, where he lost a friend. Appellant performed very well in the Marines, although he did go AWOL when he was denied leave for a family emergency. After being disciplined by the Marines, he received an honorable discharge.

¶98 The evidence presented also showed Appellant has four children, the oldest of whom was the product of a teen-aged relationship. This son, MS, described Appellant as a "kind, very passionate and intelligent person" who made efforts to keep in touch with him. Appellant's three children with his wife, Azucena Vasquez, have a strong bond with him and one of them is suffering due to Appellant's incarceration. Although Mrs. Vasquez moved with the children to California, she returned with them to Oklahoma to support Appellant. Two young men, one of them Appellant's girlfriend's son, recounted how Appellant looked after them and tried to help them.

¶99 There was also evidence that Appellant changed when he returned from Iraq and seemed depressed before the murders. Appellant had a girlfriend who was addicted to methamphetamine, and he tried to help her children. Appellant used drugs to numb himself and had been diagnosed with PTSD. He suffered nightmares, panic attacks, and felt disassociated. He also had symptoms of depression and anxiety. He appeared to voice his emotional pain through making physical complaints. All witnesses expressed their desire for Appellant's life to be spared.

¶100 Upon re-weighing the remaining valid aggravating circumstances against the mitigating evidence, we find the aggravating circumstances outweigh the mitigating evidence. If the jury had considered only these two valid aggravating circumstances in its sentencing decision, we are convinced beyond a reasonable doubt the jury would have imposed the sentence of death on Counts 1 and 2. See Posey, 2024 OK CR 10

INEFFECTIVE ASSISTANCE OF COUNSEL

¶101 Proposition VIII raises Appellant's contention that his attorneys were ineffective. Specifically, he argues his counsel failed to call these four additional witnesses to testify in mitigation: his mother, Ruth Delao; his brother, Alfredo Vasquez, Jr.; his wife, Azucena Vasquez; and his daughter, IV. In conjunction with this claim, Appellant has filed a motion to supplement the record and request to remand for evidentiary hearing pursuant to Rule 3.11, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18. App. (2023).

¶102 This Court reviews ineffective assistance of counsel claims under the two-part test mandated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687 (1984). Malone v. State, 2013 OK CR 1293 P.3d 198

¶103 The Court begins its analysis with the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689. Appellant must overcome this presumption and demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. Id. "When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed." Bland v. State, 2000 OK CR 114 P.3d 7022000 OK CR 11

¶104 We review an application or motion under Rule 3.11(B)(3)(b) pursuant to the analysis set forth in Simpson, 2010 OK CR 6

¶105 Affidavits from each witness Appellant claims should have testified are appended to his Rule 3.11 motion. We address these witnesses' affidavits in the order in which they are attached to the motion. Our consideration of these affidavits is only for the purpose of deciding the merits of the motion; they are not part of the record on appeal.

¶106 Daughter, IV. Had IV testified, she would have told the jury: Appellant was a very loving father and made a lot of jokes; she noticed him changing around 2017; she suffers from mental illness and takes several medications as a result; she is "transitioning" from female to male; Appellant is supportive of her; and she loves Appellant and would have begged the jury to spare his life.

¶107 Wife, Azucena Vasquez. Had Mrs. Vasquez testified, she would have told the jury: Appellant was always helpful toward others, with a loving and caring personality; they were married in 2003 and have three children, IV, age seventeen, DV, age sixteen, and LV, age six; Appellant received a PTSD diagnosis after his first tour in Iraq and was medicated for it; he changed after that first tour; Appellant stopped taking the prescribed medication and began using alcohol and drugs; Appellant became irritable and had angry outbursts; he could not keep a job; she separated from him in 2017 due to his personality changes; they got back together in 2018 and planned to move to California; and his death would be devastating to their children.

¶108 Brother, Alfredo Vasquez, Jr. Had Vasquez testified, he would have told the jury: Appellant was a very talkative and intelligent child; their father abused alcohol and that caused a lot of fighting and arguing; their grandfather would have to get involved in some fights between their parents; because of their younger brother's accident and medical condition, they had to move a lot; Appellant's personality changed after he returned from his first tour in Iraq; Appellant appeared to suffer from survivor's guilt; he was easily frustrated and became more authoritarian; Appellant exhibited many PTSD symptoms and began self-medicating with alcohol and drugs by 2017; Appellant started hanging out with known drug users in 2017; he urged Appellant to seek treatment for his PTSD; and losing Appellant would have a huge impact on his life.

¶109 Mother, Ruth Delao. Had she been called as a witness, Delao would have told the jury: Appellant's father was emotionally and physically abusive and he was fearful of him; the younger brother's accident and medical diagnosis were traumatic for her children; Appellant was a caregiver for his younger brother; Appellant felt for those in need and was active during high school in several areas, along with having many friends; during Appellant's first tour in Iraq, she learned his superiors were worried about him and Appellant's behavior changed to where he was not engaging in his day-to-day activities, including combat situations; after Appellant came home from his first tour, she learned of his PTSD diagnosis; she observed his symptoms worsening after each tour of duty; Appellant could not keep a job and had trouble sleeping; Appellant began self-medicating with alcohol and began associating with a different people rather than his old friends; and she feels Appellant is innocent and there is no justice in killing an innocent man.

¶110 The defense presented the following witnesses in mitigation: Appellant's father, Alfredo Vasquez, Sr.; half-brother, Josue Soto; maternal aunt, Raquel Livingston; son, MS; maternal uncle, Hiram Navedo; childhood friend, Bruce Henson; juvenile friends, NW and AM; employer, Edwardo Delgado; friend, Misty Honeysuckle; fellow Marines, Tiffany McFarlane, Stanville Coleman, and Matthew Grimmer; Detective Adam Good; the mother of a friend, Aimee Feather; and Licensed Professional Counselor, Cathy Olberding.

¶111 Their testimony included evidence about Appellant's life before he left home, his life in the Marines, his married life, and his life as an adult after leaving the Marines. Appellant's childhood was marred by his physically and emotionally abusive father, who also abused drugs and alcohol and left the family when Appellant was five years old; Appellant's mother had a volatile relationship with her second husband who singled out Appellant for unequal treatment; after their divorce, the family struggled with poverty and Appellant had to help his mother with her cleaning job; Appellant was a loving caregiver for his younger brother who suffered from a chronic illness; Appellant graduated from high school and witnesses described him as a peacekeeper and protective friend, despite the rough, drug and violence filled neighborhood where he grew up.

¶112 Appellant presented evidence of his military service. He enlisted in the Marines and served two tours in Iraq. While there, he spent more than a year in Fallujah, where he lost a friend. Appellant performed very well in the Marines, although he did go AWOL when he was denied leave for a family emergency. After being disciplined by the Marines, he received an honorable discharge.

¶113 The evidence presented also showed Appellant has four children, the oldest of whom was the product of a teen-aged relationship. This son, MS, described Appellant as a "kind, very passionate and intelligent person" who made efforts to keep in touch with him. Appellant's three children with his wife, Azucena Vasquez, have a strong bond with him and one of them is suffering due to Appellant's incarceration. Two young men, one of whom the son of Appellant's girlfriend, told how Appellant looked after them and tried to help them.

¶114 There was also evidence that Appellant changed when he returned from Iraq and seemed depressed before the murders. Appellant had a girlfriend who was addicted to methamphetamine, and he tried to help her children. Appellant used drugs to numb himself and had been diagnosed with PTSD. He suffered nightmares, panic attacks and felt disassociated and he also had symptoms of depression and anxiety. He appeared to voice his emotional pain through making physical complaints. All witnesses expressed their desire for Appellant's life to be spared.

¶115 As an initial matter, most of the proposed testimony of the four complained of witnesses was cumulative to that which was actually presented. Testimony about Appellant's rough childhood was squarely before the jury, as was his caring, helpful nature. More evidence on these issues was unlikely to have favorably impacted the jury. "Additional evidence on these points [defendant's background and humanizing features] would have offered an insignificant benefit, if any at all." Wong v. Belmontes, 558 U.S. 15, 23 (2009). Moreover, although appellate counsel avers these four witnesses would have personally appeared to testify at trial, none of their affidavits contain statements that they would have done so.

¶116 Absent from Appellant's Rule 3.11 motion is any evidence of his counsels' thought processes in making the strategic decision regarding presentation of mitigation evidence. Appellant bears the burden to rebut the presumption that counsel made a reasonable strategic decision regarding presentation of mitigation evidence. See Dunn v. Reeves, 594 U.S. 731, 739 (2021) (a defendant has the burden to rebut the presumption that his counsel made a reasonable strategic decision). He makes no claim that his attorneys did not discover the information contained in the four witnesses' affidavits and he offers nothing from his attorneys regarding their mitigation strategy. "[A] silent record cannot discharge a prisoner's burden." Id., at 743. The affidavits themselves offer some insights into the question of why these witnesses were not called.

¶117 First, IV indicated she suffered mental problems and was taking medication for those problems. She also indicated she was "transitioning" from female to male. There may have been concern about how she would present herself as she testified, or if her mental condition was too fragile to withstand testifying in court. Moreover, the attorneys may have been reluctant to inject transgender ideology into the jury's consideration of Appellant's mitigation evidence for fear that it may have led to confusion of the mitigation issue.

¶118 Second, Mrs. Vasquez stated Appellant stopped taking the prescribed PTSD medication and began using alcohol and drugs, he became irritable and had angry outbursts, he could not keep a job, and she separated from him in 2017 due to his personality changes. None of these statements helps Appellant given that he was using methamphetamine heavily, was angry, and was unemployed at the time of the murders. Also, that Mrs. Vasquez left Appellant and moved to California because of his behavior would hardly put him in a positive light.

¶119 Third, Alfredo Vasquez, Jr., stated Appellant was easily frustrated, exhibited many symptoms of PTSD, self-medicated with drugs and alcohol, hung out with drug users, and refused to seek treatment for his PTSD. Again, Appellant's easy frustration, refusal to seek PTSD treatment and drug using lifestyle were not positive qualities for mitigation purposes.

¶120 Finally, Delao stated that during Appellant's first tour in Fallujah, Iraq, she received information from his superiors that Appellant was not performing his duties, including his combat duties. She also stated Appellant could not keep a job, became distant and began self-medicating with alcohol. Delao further stated Appellant changed his circle of friends and began associating with different groups of people. For the jury to learn Appellant was shirking his duties as a Marine during combat would have painted Appellant in a negative light, thereby tarnishing his status as a Marine veteran. Similarly, his mother's recognition that he could not hold a job, withdrew from his family, abused alcohol, and turned away from his old friends would not have shown Appellant in a positive light to the jury.

¶121 Based upon the mitigation evidence actually presented and upon the potential negative aspects of the subject witnesses' proposed testimony, we find defense counsel utilized a reasonable strategy in presenting mitigation evidence in this case. The evidence presented told the jury Appellant's life history through people who knew him personally, with several attesting to his fine character as a friend, a Marine, and a good person who helped people. The testimony of the four subject witnesses would not have caused the jury to find that the mitigating factors outweighed the aggravating factors and consequently sentence him to life in prison rather than death. Cf. Posey, 2024 OK CR 102010 OK CR 6230 P.3d 888

ACCUMULATION OF ERROR

¶122 In Proposition X, Appellant claims he is entitled to relief on the basis of cumulative error. We found only a single error in this case, the invalidity of the especially heinous, atrocious or cruel aggravator as applied to Count 2, the murder of Baby H. We showed in Proposition IX that this error caused Appellant no prejudice. As we found only one harmless error, there is no cumulative error. Coddington v. State, 2011 OK CR 17254 P.3d 684

MANDATORY SENTENCE REVIEW

¶123 In Proposition XI, Appellant urges relief under our mandatory sentence review. "This Court must determine in every capital case: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of the statutory aggravating circumstances." Shepard v. State, 2023 OK CR 15538 P.3d 518

¶124 Our review of the record in this case demonstrates the death sentences on Counts 1 and 2 were not the result of trial error or improper evidence or witness testimony and that the death sentences were not imposed under the influence of passion, prejudice or any other arbitrary factor. As fully addressed in Proposition IX, the jury's findings on Counts 1 and 2 that Appellant knowingly created a great risk of death to more than one person and that at the present time there exists a probability that Appellant will commit criminal acts of violence that would constitute a continuing threat to society were amply supported by the evidence.

¶125 Even if the especially heinous, atrocious or cruel aggravator is invalid on Count 2, weighing the remaining aggravating circumstances and evidence against the mitigating evidence presented, we find, as did the jury, that the aggravating circumstances in this case outweigh the mitigating circumstances. The jury's finding on Counts 1 and 2 that during the commission of the murder, Appellant knowingly created a great risk of death to more than one person and that at the present time there exists a probability that Appellant will commit criminal acts of violence that would constitute a continuing threat to society were well supported by the evidence. Had the jury considered only these valid aggravating circumstances, we are convinced beyond a reasonable doubt that the jury would have imposed the same sentence of death. Proposition XI is denied.

DECISION

¶126 The Judgment and Sentence is hereby AFFIRMED. The Motion to Supplement the Record on Appeal and for Evidentiary Hearing on Claim of Ineffective Assistance of Trial Counsel is DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2025), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF MCCLAIN COUNTY
THE HONORABLE LEAH EDWARDS, DISTRICT JUDGE

 
 
 
 APPEARANCES AT TRIAL

 CATHERINE C. HAMMARSTEN
 10600 S. PENN, STE. 16, #383
 OKLAHOMA CITY, OK 73170
 COUNSEL FOR DEFENDANT

 LAURA NEAL
 127 N.W. 10TH STREET
 OKLAHOMA CITY, OK 73103
 COUNSEL FOR DEFENDANT
 
 
 APPEARANCES ON APPEAL

 JAMES L. HANKINS
 2524 N. BROADWAY
 EDMOND, OK 73034
 COUNSEL FOR APPELLANT
 
 
 
 
 TRAVIS WHITE
 FIRST ASST. DISTRICT
 ATTORNEY
 PATRICIA HIGH
 PATRICK CROWE
 ASST. DISTRICT ATTORNEYS
 121 N. 2ND STREET, #212
 PURCELL, OK 73080
 COUNSEL FOR STATE
 
 
 GENTNER F. DRUMMOND
 OKLA. ATTORNEY GENERAL
 CHRISTINA A. BURNS
 JENNIFER L. CRABB
 ASST. ATTORNEYS GENERAL
 313 NE 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 
 

 

OPINION BY: LUMPKIN, P.J.
MUSSEMAN, V.P.J.: Concur
LEWIS, J.: Concur
HUDSON, J.: Concur
ROWLAND, J.: Concur

FOOTNOTES

12 O.S.2021, § 2107

1993 OK CR 59867 P.2d 13092023 OK CR 12533 P.3d 354