OSCN Found Document:NAPOLEAN v. STATE

 

 
 NAPOLEAN v. STATE
2025 OK CR 25
Case Number: F-2024-123
Decided: 12/18/2025
Mandate Issued: 12/18/2025
THE COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA
Cite as: 2025 OK CR 25, __ P.3d __

 
PATRICK MARQUISE NAPOLEON, Appellant,
v.
THE STATE OF OKLAHOMA, Appellee.

O P I N I O N

ROWLAND, JUDGE:

¶1 Appellant Patrick Marquise Napoleon appeals his Judgment and Sentence from the District Court of Tulsa County, Case No. CF-2017-2208, for Assault and Battery with a Deadly Weapon, in violation of 21 O.S.2011, § 652

(1) whether the district court erred in denying his motion to exclude DNA evidence because the DNA was contaminated;

(2) whether the district court erred in denying his motion to exclude DNA evidence because the probabilistic genotyping testing that was conducted was not sufficiently reliable;

(3) whether the district court improperly limited his defense;

(4) whether the district court admitted prejudicial hearsay evidence;

(5) whether he was denied effective assistance of counsel;

(6) whether he was denied a fair trial because of the prosecution's failure to disclose exculpatory evidence; and

(7) whether an accumulation of error deprived him of a fair trial.

¶2 We find relief is not required and affirm the Judgment and Sentence of the district court.

FACTS

¶3 This case involves the ruthless, near-fatal stabbing of Nancy Johnson Jones outside Hillcrest Medical Center in Tulsa on April 6, 2017. Jones had taken a quick break from visiting her stepmother to get a snack at a nearby QuikTrip before nightfall. As she approached the hospital's north entrance, her attacker came up behind her, plunged a serrated boning knife into her neck, and fled on foot towards the parking garage without taking anything from her. The disputed issue at trial was the identity of the perpetrator.

¶4 A hospital employee witnessed the attack from near the north hospital entrance. She identified Napoleon as Jones's attacker at trial. She described the attacker to police at the scene, explaining he was wearing camouflage pants and something white on his forearm. Another hospital employee, who was in her car in the parking garage, identified Napoleon as the person she saw wearing camouflage pants hurriedly putting objects in a parking garage trashcan and dashing up the stairs. Hospital security apprehended Napoleon on the street not far from the parking garage within fifteen minutes of the attack. Based on interviews with the employees, police found the bloody knife used in the stabbing in the parking garage trashcan along with the white sock the attacker wore over his hand. Police also found a pair of camouflage pants in a nearby stairwell. The employee in the parking garage testified she saw a man with the same build as the man she had seen in the camouflage pants running down the adjacent stairwell wearing black pants. She believed the man in the camouflage pants and black pants were the same person. When police arrested Napoleon, he was wearing black thermal pants.

¶5 DNA analysis using random match probability on the sock and camouflage pants performed by the Tulsa Police Department's forensic lab could neither exclude Napoleon nor include him because the DNA collected from both items was a mixture of two or more persons. After Napoleon's first trial ended in a mistrial, the State enlisted Sorenson Forensics to conduct probabilistic genotyping testing via the software program BulletProof. The software program analyzed the raw data from the previously indistinguishable DNA mixtures with Napoleon's known DNA profile to calculate a ratio of the likelihood his known profile would be included within the mixture and, if so, the approximate contribution proportion of his sample within the mixture. The results showed that it was far more likely that Napoleon's DNA was a major contributor to the mixture of DNA on both the sock and pants and that his DNA exceeded 50% of both mixtures. 

¶6 Napoleon maintained his innocence and offered an alibi. 

1. DNA Contamination

¶7 Napoleon claims the district court erred in admitting, over his objection, some of the prosecution's DNA evidence. He challenges the probabilistic genotyping testing conducted by Sorenson Forensics, using the software program BulletProof, on the DNA mixture profiles collected from the attacker's sock and camouflage pants. He maintains the DNA evidence obtained from those items was too contaminated for the results of testing to be reliable and relevant. According to Napoleon, ample evidence suggested that the DNA obtained from the sock and camouflage pants had been contaminated "both by possible third-party contamination" or "cross-contamination of evidentiary items with Mr. Napoleon's DNA as a result of evidence mishandling at Mr. Napoleon's first trial." We review the district court's ruling admitting the evidence for an abuse of discretion. Jackson v. State, 2024 OK CR 11548 P.3d 473Posey v. State, 2024 OK CR 10548 P.3d 1245cert. denied, 145 S. Ct. 1142 (2025).

¶8 Any contamination from the handling of the sock and pants at Napoleon's first trial did not render the probabilistic genotyping results unreliable. Before trial, Napoleon unsuccessfully sought to exclude the probabilistic genotyping test results, arguing, among other things, that contamination of the sock and pants rendered the results unreliable. The district court considered Napoleon's motion in conjunction with a Daubert hearing. The State presented the testimony of Kent Harman, who was recognized as an expert in probabilistic genotyping without objection. He explained that probabilistic genotyping accounts for multiple contributors and explained how it does so and how "contamination" from others does not render its results unreliable. Napoleon offered nothing to contradict the expert's conclusions and methodology.

¶9 Based on this record, the district court did not abuse its discretion in admitting the probabilistic genotyping results to assist the jury in assessing the otherwise ambiguous DNA evidence. The challenged testing supported a finding that Napoleon was a contributor of the DNA on the sock and pants. Any possible contamination was factored into the results and affected only the weight of the evidence rather than its admissibility. See State v. Hovet, 2016 OK CR 26387 P.3d 951 Fixico v. State, 1987 OK CR 64735 P.2d 580

2. Reliability of Probabilistic Genotyping

¶10 Napoleon claims the district court erred by overruling his motion to exclude the probabilistic genotyping software program (PGSP) results from BulletProof used to analyze the DNA mixtures collected from the attacker's sock and pants. He contends that BulletProof and the methodology it employs are insufficiently reliable to pass muster under Daubert and Taylor v. State, 1995 OK CR 10889 P.2d 319Daubert analysis for novel scientific evidence in Oklahoma criminal cases). de novo. Bosse v. State, 2017 OK CR 10400 P.3d 834Daubert.

¶11 The Oklahoma Evidence Code governs the admissibility of expert testimony and sets forth certain criteria for admissibility. 12 O.S.2021, §§ 2702Day v. State, 2013 OK CR 8303 P.3d 291See also Taylor, 1995 OK CR 10Daubert is flexible and designed to accommodate many factors without setting forth a definitive checklist or test. Day, 2013 OK CR 8Taylor, 1995 OK CR 10

¶12 Contrary to Napoleon's claim, the district court held an extensive Daubert hearing on February 5, 2021. Daubert factors weighed in favor of admission of the probabilistic genotyping results.

¶13 On appeal, Napoleon primarily challenges the reliability of the DNA identification evidence generated by BulletProof. He contends that the State never provided him with BulletProof's source code information and that without it, there was "no way for the trial court to determine that such evidence was reliable or based on sufficient facts or data . . . ." This claim is not supported by the record because, according to the expert, BulletProof uses EuroForMix algorithms to perform its mathematical calculations and its code is "open source[,]" free, and downloadable for review of its accuracy, as well as being peer reviewed and generally accepted in the scientific community. 

¶14 Our review of the expert's testimony shows BulletProof meets the Daubert factors. When the evidence presented is weighed against the relevant Daubert reliability factors, we, like the district court, find that BulletProof's DNA identification methodology and the match statistic reported in this case was sufficiently reliable to warrant admission. Accordingly, we find the district court did not err in admitting the PGSP evidence. This claim is denied.

3. Right to Present a Defense

¶15 Napoleon claims he was denied his right to present a defense because of the district court's limitations on former juror A.J.'s testimony about her knowledge of her fellow jurors handling of the clothing evidence during Napoleon's first trial. He maintains that he should have been able to ask questions about the handling and opening of specific clothing items to further refute the State's DNA evidence and support his claim that his DNA was transferred to the sock and pants from his first jury's cross contaminating those items with his other clothes. Because Napoleon failed to object to the district court's limitations on A.J.'s testimony, our review of this claim is for plain error only. See Posey, 2024 OK CR 10Id. 2024 OK CR 10Id.

¶16 Napoleon fails to show that the district court committed plain error in its limitations on A.J.'s testimony. First, defense counsel agreed to the limitation, and Napoleon cannot now complain about it on appeal. See Tryon v. State, 2018 OK CR 20423 P.3d 617Id. 2018 OK CR 20Id. Stated another way, evidence is material when, had it been admitted, it would have created reasonable doubt that did not exist without the evidence. Id. Here the defense was able to defend against the State's DNA evidence through A.J. who testified that the clothing evidence was sent back with the first jury and handled by jurors without gloves. Based on her testimony, defense counsel was able to argue his contamination theory during closing argument to undermine the prosecution's DNA evidence. Because Napoleon has not shown that additional testimony from A.J. might have affected the outcome of his trial, we find no plain error from the agreed limitation. Accordingly, this claim is denied.

4. Hearsay

¶17 Napoleon claims he was denied a fair trial by the admission of testimonial hearsay without a showing the witness was unavailable. Review of this claim is for plain error only because Napoleon failed to object to the challenged testimony at trial.

¶18 There is no error, plain or otherwise. The prosecutor impeached Jasona Tibbetts, Napoleon's alibi witness, with the trial testimony of the alibi witness he presented in his first trial who had placed him at a different location than Tibbetts. The evidence was admitted to show Tibbetts's testimony was fabricated and unworthy of belief. Accordingly, the alibi testimony from his first trial was not offered for its truth making it not hearsay. See 12 O.S.2021, § 2801Smith v. Arizona, 602 U.S. 779, 785 (2024); Tryon, 2018 OK CR 20

5. Ineffective Assistance of Counsel

¶19 Napoleon claims defense counsel was ineffective for failing to: (1) impeach the eyewitness to the stabbing; (2) retain a DNA expert; (3) object to the introduction of impermissible hearsay evidence; and (4) call additional defense witnesses. This claim requires no relief.

¶20 This Court reviews claims of ineffective assistance of counsel to determine: (1) whether counsel's performance was constitutionally deficient; and (2) whether counsel's performance prejudiced the defense depriving the defendant of a fair trial with reliable results. Strickland v. Washington, 466 U.S. 668, 687 (1984); Malone v. State, 2013 OK CR 1293 P.3d 198Fulgham v. State, 2016 OK CR 30400 P.3d 775Malone, 2013 OK CR 1Harrington v. Richter, 562 U.S. 86, 112 (2011)). This Court need not determine whether counsel's performance was deficient if there is no showing of harm. See Malone, 2013 OK CR 1

¶21 Napoleon first faults defense counsel for failing to impeach the trial testimony of an eyewitness with inconsistent statements she made in prior proceedings about her location and vantage point when she witnessed the stabbing as well as her statements concerning the path taken by the attacker after the stabbing. The record reveals defense counsel impeached the eyewitness's testimony concerning her on-scene identification of Napoleon. The other discrepancies cited by Napoleon on appeal concern matters ancillary to the core facts of her testimony and Napoleon has not shown a reasonable probability that counsel's failure to address any of these discrepancies affected the outcome of his trial.

¶22 Next, he faults defense counsel for failing to retain a DNA expert to refute the State's DNA evidence. The record shows after the Daubert hearing, defense counsel obtained a continuance to hire an expert to review the prosecution's DNA evidence. The record further shows that counsel made efforts to obtain an expert and anticipated presenting expert testimony. The record does not show that counsel either dropped the ball or incorrectly decided against presenting expert testimony. According to counsel's August 2022 motion for continuance, the defense expert was "unable to prepare a report without more information and more time." The motion itself is evidence that counsel was making efforts to obtain an expert for trial. This record supports a finding that counsel exercised due diligence in efforts to secure a DNA expert and made a strategic decision not to call an expert likely because the expert could not provide a favorable report. See Strickland, 466 U.S. at 690-91; Harris v. State, 2019 OK CR 22450 P.3d 933

¶23 We have rejected on the merits Napoleon's claim that he was denied a fair trial because of the admission of testimonial hearsay. See Proposition IV, supra. Accordingly, he cannot show the necessary prejudice to prevail on his ineffective assistance of counsel claim based on defense counsel's failure to object to the challenged testimony.

¶24 Lastly, he claims defense counsel was ineffective for failing to call additional defense witnesses. His claim is based on nothing but speculation and he has not shown the necessary prejudice to prevail. For the foregoing reasons, we reject Napoleon's ineffective assistance of counsel claim.

6. Brady Claim

¶25 Napoleon claims he was denied a fair trial because the State failed to provide him with exculpatory evidence, namely the source code behind Sorenson Forensics' PGSP, in violation of Brady v. Maryland, 373 U.S. 83 (1963) (holding due process requires the prosecution to disclose exculpatory and impeachment evidence favorable to the accused). Napoleon has not alleged any Brady violation until now, making our review for plain error only.

¶26 To establish a Brady violation, the defendant must demonstrate that the prosecution suppressed evidence, the evidence was favorable to the accused, and the evidence was material to the defense. Fuston v. State, 2020 OK CR 4470 P.3d 306United States v. Bagley, 473 U.S. 667, 682 (1985). The record shows that Napoleon knew for more than two years before trial that Sorenson's PGSP BulletProof used the EuroForMix source code which was open and available for anyone to download. He offers nothing to refute the expert's claim concerning the openness of BulletProof's source code. Hence, Napoleon's Brady claim fails on the first of the three Brady elements because the prosecution did not suppress the source code. See United States v. Wooten, 377 F.3d 1134, 1142 (10th Cir. 2004) ("Evidence is not suppressed within the meaning of Brady if it is made known and available to the defense prior to trial."). Accordingly, no relief is required.

¶27 Napoleon also fails to show he was deprived of a fair trial because of the police's failure to obtain and make available video surveillance footage from the QuikTrip near the crime scene. The lead detective testified that one of his officers went to the QuikTrip the night of the attack and watched the video surveillance footage. That officer reported the footage showed the victim purchasing a snack minutes before the attack. The officer did not observe Napoleon on the video and did not collect the video because it had no apparent evidentiary value.

¶28 In a case like this where the favorability of the evidence to the defense is unclear, a criminal defendant must show bad faith on the part of the police otherwise the failure to preserve potentially useful evidence does not constitute a denial of due process. Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988); Martinez v. State, 2016 OK CR 3371 P.3d 1100

¶29 Nor can he show he was denied a fair trial from the State's alleged mishandling of the DNA evidence by the jury in his previous trial. His characterization of the DNA evidence as exculpatory is unsupported by, and inconsistent with, the record evidence. More importantly, he fails to show the State, or its agents, acted in bad faith. For these reasons, we find no error and deny this claim.

7. Cumulative Error

¶30 Napoleon claims that even if no individual error in his case merits relief, the cumulative effect of the errors committed requires dismissal or reversal and remand for a new trial. "The cumulative error doctrine applies when several errors occurred at the trial court level, but none alone warrants reversal." Tafolla v. State, 2019 OK CR 15446 P.3d 1248Id. And there can be no accumulation of error if there is no individual error. Lavorchek v. State, 2019 OK CR 13443 P.3d 573

DECISION

¶31 The Judgment and Sentence of the district court is AFFIRMED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2025), the MANDATE is ORDERED issued upon delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY
THE HONORABLE WILLIAM D. LAFORTUNE
DISTRICT JUDGE

 
 
 APPEARANCES AT TRIAL
 
 OLIVER W. ARBOGAST
 ATTORNEY AT LAW
 P.O. BOX 8417
 TULSA, OK 74101
 COUNSEL FOR DEFENDANT
 
 
 
 
  
 APPEARANCES ON APPEAL
 
 AARON W. EASTON
 WIRTH LAW OFFICE
 101 PARK AVE., SUITE 490
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR APPELLANT
 
 
 JOHN TJEERDSMA
 MATT KEHOE
 ASST. DISTRICT ATTORNEYS
 500 S. DENVER, SUITE 900
 TULSA, OK 74103
 COUNSEL FOR STATE
 GENTNER F. DRUMMOND
 ATTY. GENERAL OF OKLAHOMA
 RANDALL YOUNG
 ASST. ATTORNEY GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 

OPINION BY: ROWLAND, J.
LUMPKIN, P.J.: Concur
MUSSEMAN, V.P.J.: Concur
LEWIS, J.: Concur
HUDSON, J.: Concur

FOOTNOTES

21 O.S.Supp.2015, § 13.1

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) (governing admissibility of scientific and other technical evidence).

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise, if:

1. The testimony is based upon sufficient facts or data;

2. The testimony is the product of reliable principles and methods; and

3. The witness has applied the principles and methods reliably to the facts of the case.

Section 2702 has been amended effective September 1, 2025.

evidently, held an 'extensive Daubert hearing,' lasting 'about 20 minutes' on 2/5/2021." (emphasis added) Appellant's Brief at 21. He then claims that no transcript of the hearing exists and that the docket sheet contains no entry for that date. Id. This assertion is belied by the record. The appellate record contains the transcript of the Daubert hearing covering the admissibility of the genotyping evidence comprising 72 pages. The district court noted at a subsequent hearing that the Daubert hearing started in the afternoon with a ruling at 5:15 p.m.