OSCN Found Document:KETCHUM v. STATE OF OKLAHOMA

 

 
 KETCHUM v. STATE OF OKLAHOMA2026 OK CR 17Case Number: F-2024-328Decided: 06/11/2026Mandate Issued: 06/11/2026COURT OF CRIMINAL APPEALS OF THE STATE OF OKLAHOMA
Cite as: 2026 OK CR 17, __ P.3d __

 

CODY LEE KETCHUM, Appellant, v. STATE OF OKLAHOMA, Appellee.

O P I N I O N

HUDSON, JUDGE:

¶1 Appellant, Cody Lee Ketchum, 21 O.S.Supp.2012, § 701.721 O.S.2011, § 454

¶2 The Honorable Timothy E. Mills, Associate District Judge, presided at trial and pronounced judgment and sentence in accordance with the jury's verdicts. Judge Mills further ordered the sentences to run concurrently and imposed various costs and fees. Ketchum now appeals.

FACTS

¶3 On January 20, 2017, Appellant shot and killed Holly Cantrell and abandoned her body in a secluded wilderness area known as Cardinal Point. At the time of the murder, Holly and Appellant were engaged in an extramarital affair, and Holly had recently learned she was pregnant. The remoteness of the location concealed the crime, and Holly's remains were not discovered for more than a year.

¶4 Holly disappeared on the afternoon of Friday, January 20, 2017. According to her husband, Tommy Cantrell, the day began routinely. Holly woke up, got her two sons ready for school, made breakfast for the family, took the children to the bus stop, and then returned home to prepare for work. She put on her green scrubs, kissed her husband goodbye, and drove to the McAlester Regional Health Center, where she worked as a physical therapy technician. Her husband never saw her again.

¶5 Holly clocked in at the health center at 7:41 a.m. She had previously scheduled the afternoon off and therefore planned to work only that morning. While at work, Holly arranged with another physical therapy technician, Johnny Cullin, to pick up lunch at Taco Bell during their 30-minute lunch break. However, she changed those plans after receiving a text message from Appellant. Cullin understood that Appellant would be picking Holly up instead. Indeed, the phone records later obtained by law enforcement confirmed this.

¶6 The pair had the following conversation between 11:40 a.m. and 11:50 a.m. that morning:

Appellant: Can u take off sooner

Holly: Like what time

Appellant: 12 lol

Holly: Yeah

Appellant: Really

Holly: You almost here

Holly: Yeah

Appellant: Where meet at

Holly: Pick me up here

Holly: You in your truck

Appellant: O ok

Appellant: Y ya

Holly: Just checking, I got to get my blanket out of my truck

Appellant: O ya y it's hot outside

Holly: Cus

Appellant: Cuz y

Holly: Okay so I won't grab it..lol

Holly: Where you at

Appellant: Wal-Mart

Holly: What are you doing there

Appellant: Passing it lol

Holly: Oh okay

(Grammar and syntax in original). Most of these messages were later deleted from Appellant's phone. 

¶7 Holly clocked out from work at 11:56 a.m. and left the health center with her purse. Thereafter, surveillance footage from the McAlester Regional Health Center captured her getting into Appellant's green truck. She never returned to work to retrieve her car. This was the last time Holly was seen alive.

¶8 About twenty-five minutes later, at 12:21 p.m., Appellant's phone accessed a cell tower near the Cardinal Point Recreation Area on Lake Eufaula, approximately twelve miles north-northeast of McAlester. 

¶9 Holly's husband Tommy expected Holly to be home from work around 4 p.m. that day, as was typical for her. When she did not arrive as expected, Tommy assumed Holly was working overtime. However, around 5:30 or 6:00 p.m., Tommy began to worry. He tried calling and texting Holly but received no answer. Tommy loaded up his sons, and they went to the health center to look for her. Upon arrival, one of his sons went inside to find her, but she was not there. Tommy eventually located Holly's truck in the health center parking lot. Fearing the worst, Tommy went to the McAlester Police Department to seek help but was told he had to wait at least twenty-four hours before filing a missing person's report. He then spent the next few hours searching for Holly without success.

¶10 As word about Holly's disappearance spread, Appellant began to worry. Phone records from the night of January 20th showed Appellant texted a friend, "I'm afraid to do anything because I was the last one to talk to her." Appellant also received a text from a friend concerning Holly's disappearance, telling him that "someone is saying she is with u and she is also preg and its yours."

¶11 On Sunday, January 22, Appellant expressed concern to his mother in the following text conversation:

Appellant: Are you sure its ok if I go to church[.] I don't want to scare nobody

Mom: Lol make sure and take your gun

Mom: Sure you ain't done anything

Appellant: Well just don't want no problems for you

(Grammar and syntax in original).

¶12 The next day, January 23rd, the McAlester Police Department assigned then-Detective Preston Rodgers to Holly's case. Det. Rodgers called Appellant to gather information about Holly. During their conversation, Appellant admitted he and Holly had been having an affair for eight months. Appellant told Det. Rodgers he was in town on January 20th running errands, picked up Holly around lunch, and then dropped her off at the Braum's located on the Highway 69 bypass around 12:20 p.m.--about the same time Appellant's phone accessed the cell tower near Cardinal Point. 

¶13 Appellant also spoke with McAlester Police Officer Richard Bedford. Appellant similarly told Off. Bedford that he picked Holly up from the medical center on January 20th but said he dropped her off at Braum's to meet with some friends around 12:30 p.m. Appellant further elaborated that Holly asked him to come back to pick her up, but he was unable to do so because he had "other things to do." However, Appellant later told his pastor, Brent Jarrett, that he had left Holly at Braum's but "forgot to go back and get her." 

¶14 Det. Rodgers reviewed the January 20th lunch-hour security footage from the Braum's in question. He did not see Holly on any of the footage, nor did he see Appellant's truck. Det. Rodgers also checked security footage from businesses across the street. Neither Holly nor Appellant's truck appeared in that footage. To be thorough, he then checked the only other Braum's in McAlester, but neither Holly nor Appellant appeared on that footage either.

¶15 On February 25, 2017, a month after Holly disappeared, Holly's purse was found by Shaun Rogers while he was hunting at the Cardinal Point Recreation Area. Rogers was walking his usual route on the north end of Cardinal Point when he discovered a red purse. Nothing was covering the purse up. "There weren't any leaves, debris, or anything of that sort[.]" Some of the purse's contents had spilled out, as though the purse had been thrown to the ground. One of the items was Holly's McAlester Regional Health Center ID badge. According to Rogers, the purse was not there when he hunted the same location two weeks earlier, nor did the purse appear to have any moisture on it despite the damp conditions. To Rogers, "[i]t looked as if [the purse] had been just recently put there." Notably, cellular site data showed that Appellant's cell phone had accessed the cell tower near Cardinal Point again on February 22, 2017, at 3:07 p.m. just three days before Rogers found Holly's purse.

¶16 Rogers called the Pittsburg County Sheriff's Department to report the purse, waited for officers to arrive, and directed them to the purse. A subsequent inventory of the purse's contents revealed several identification cards belonging to Holly, Social Security cards for Holly and her family, credit cards, pens, and other miscellaneous items. Papers relating to Holly's pregnancy were also found in the purse.

¶17 It was nearly a year before any new evidence surfaced. On February 18, 2018, Holly's partial skeletal remains were discovered by Jerry Heaslett while he was rabbit hunting on the southern peninsula of the Cardinal Point Recreation Area. Heaslett was able to reach the southern peninsula because of the lake's low water levels, which exposed the abandoned Old Highway 60. While walking east from the highway through the woods, Heaslett came across unusual looking bones. One of the bones resembled a human skull. Heaslett exited the area, without disturbing anything, and called the Pittsburg County Sheriff's Office to report the bones. Heaslett subsequently met with deputies and directed them to the remains. A more detailed search of the area revealed several other bones, green scrubs, a black bra, and a mat of hair. Some of the bones were retrieved from pack rat nests in the area. DNA testing later done using one of the bones found at Cardinal Point confirmed the remains were Holly's.

¶18 Dr. Carlos Zambrano, a forensic anthropologist specializing in the recovery and analysis of skeletal remains, examined the remains of Holly's cranium. A sizable portion of her cranium--"the top, the face, and a bunch of the sides"--was missing. Dr. Zambrano found this "very suspicious," explaining that "[a]dult crania don't just magically fall apart." According to Dr. Zambrano, a "substantial level of force," like that of a gunshot wound, is needed to cause the skull to shatter and break in the manner Holly's skull did. The fractures throughout Holly's skull appeared to radiate from the front of her head to the back and indicated a rapid failure of the bone itself caused by a substantial level of force. Based on his training and experience, Dr. Zambrano concluded the damage to Holly's skull was "most consistent with a gunshot wound."

¶19 The medical examiner, Dr. Marc Harrison, also examined Holly's remains. However, given that his expertise pertained to skin and organs, not bones, Dr. Harrison was unable to determine a definitive manner of death. Dr. Harrison explained that an unknown manner of death is common in "skeletal cases." To make a definitive determination as to the cause of death, "one manner of death [must] override[ ] the others based on the evidence." In Holly's case, Dr. Harrison could not rule out homicide, but neither could he rule out any other manner of death.

¶20 At trial, Diane Hogue presented expert testimony relating to evidence gathered from Appellant's and Holly's phones. At the time of the investigation and trial, Hogue served as a criminal intelligence analyst for the Oklahoma State Bureau of Investigation (OSBI). Hogue's extensive law enforcement training included approximately 400 hours of cellular records analysis training from various organizations. She is a graduate of Cellular Analysis Survey Team training and has certifications from the Alpha Group, the California Department of Justice, and the Law Enforcement Intelligence Unit.

¶21 While comparing records of conversations between Appellant's phone and Holly's phone, Hogue realized Holly's phone contained text messages that were not present on Appellant's phone. To synthesize this information, Hogue created a chart to readily identify the messages sent between the pair that were missing from Appellant's phone. Numerous messages had been deleted, including messages sent on Wednesday, January 18th making plans for the pair to get together on Friday, January 20th, a text sent on January 19th confirming Appellant wanted to see Holly on the 20th, and messages relating to Holly's pregnancy.

¶22 Appellant's brother, Leslie Standstipher, testified that Appellant told him he had not seen Holly on January 20th. Standstipher discovered the lie when he watched the video footage of Holly entering Appellant's truck when she left work. According to Standstipher, Appellant was familiar with the Cardinal Point area and knew how to handle firearms.

¶23 Additional facts will be presented below as necessary.

ANALYSIS

¶24 Proposition I. Appellant complains the trial court erred when it denied the defense's request for a Daubert/Kumho hearingDaubert gatekeeping." Appellant further contends the error was not harmless because Hogue's testimony was "critical to the State's case."

¶25 Appellant requested a Daubert hearing prior to the start of voir dire. Judge Mills questioned the novelty of Hogue's process and whether Daubert gatekeeping was necessary. Judge Mills denied Appellant's motion but allowed the defense the opportunity to raise it again. Defense counsel renewed its motion on the sixth day of trial, just before Hogue took the stand. After further argument from the parties, Judge Mills again denied Appellant's motion, finding "this type of data is not new or novel."

¶26 We review a trial court's decision to admit expert testimony for an abuse of discretion. Day v. State, 2013 OK CR 8303 P.3d 291Perez v. State, 2023 OK CR 1525 P.3d 46Vance v. State, 2022 OK CR 25519 P.3d 52612 O.S.2021, § 2702

¶27 A trial judge must act as the gatekeeper to ensure that novel expert evidence is both relevant and reliable. Day, 2013 OK CR 8Daubert hearing. See Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003) (observing district court has no discretion to avoid performing its gatekeeper function). When the scientific, technical, or specialized evidence is not novel, a Daubert hearing is unnecessary. See Day, 2013 OK CR 8Harris v. State, 2004 OK CR 184 P.3d 731

¶28 We are satisfied in this case that Hogue's challenged cell site location testimony was not the product of a novel scientific theory, technique, or methodology. See Bramlett v. State, 2018 OK CR 19422 P.3d 788Daubert hearing Bramlett received was unnecessary). See, e.g., People v. Fountain, 2016 IL App (1st) 131474, ¶ 59, 62 N.E.3d 1107, 1124 (and cases therein) (observing "the use of cell phone location records to determine the general location of a cell phone is not 'new' or 'novel' and has been widely accepted as reliable by numerous courts throughout the nation."). Cell tower location testimony is certainly nothing new or novel to this Court as this type of evidence is commonly presented at trial.

¶29 Further, contrary to Appellant's assertions on appeal, the manner in which Hogue manually interpreted and summarized the raw data for the jury does not relate to the evidence's admissibility but goes instead to the weight to Hogue's testimony, not its reliability. See, e.g., United States v. Frazier, 442 F. SupP.3d 1012, 1024 (M.D. Tenn. 2020) (finding no novel challenge to the cell site analysis presented where arguments were the "sorts of cross-examination points and arguments . . . [that] go to the weight not the admissibility of the cell phone evidence."). Cf. United States v. Channon, 881 F.3d 806, 811 (10th Cir. 2018) (recognizing a database is the actual business record and that the "business record[ ] in one form may be presented in another for trial."). Nothing in the record before us on appeal supports a finding that the methodology employed by Hogue is unreliable.

¶30 All things considered, the evidence was admissible and no Daubert/Kumho hearing was required. Hogue's cell site location testimony was neither new nor novel. Hogue's testimony was appropriately analyzed under the normal rules governing the admission of expert testimony, see 12 O.S.2021, § 2702et seq., and the rules of relevancy and unfair prejudice. The trial court's denial of a Daubert/Kumho hearing was not an abuse of discretion. Proposition I is denied.

¶31 Proposition II. Appellant complains in his second proposition that Hogue's testimony was more prejudicial than probative, and its admission deprived him of his right to a fair trial. See 12 O.S.2021, §§ 2402

¶32 Appellant failed to raise this issue below by objecting to the challenged testimony on this ground. We therefore review this claim for plain error only. See Knapper v. State, 2020 OK CR 16473 P.3d 1053Swager v. State, 2024 OK CR 12548 P.3d 794Id.; 20 O.S.2021, § 3001.1

¶33 Appellant tells us on appeal that Hogue's analysis did little to show he killed the victim. Appellant argues Hogue's testimony merely showed his phone accessed a cell tower near Cardinal Point seven times between 12:21 p.m. and 12:53 p.m. on January 20, 2017, nothing more. He asserts too that Hogue's testimony carried a significant risk of the jury being misled to believe Appellant's "phone was physically 'at' the tower and that the events happened 'at' the tower." Because Hogue's testimony concerning the location of Appellant's phone on January 20, 2017, was instrumental to securing Appellant's murder conviction, Appellant contends the error in its admission affected the outcome of the proceeding. 

¶34 Contrary to Appellant's assertions, the probative value of Hogue's challenged cell site testimony was not outweighed by the danger of unfair prejudice, confusion of the issues, or misdirection of the jury. See 12 O.S.2021, § 2403Vanderpool v. State, 2018 OK CR 39434 P.3d 318See 12 O.S.2021, § 2401See Napoleon v. State, 2025 OK CR 25 State v. Hovet, 2016 OK CR 26387 P.3d 951

¶35 Proposition III. In his third proposition, Appellant challenges the sufficiency of the evidence supporting his first-degree murder conviction. Appellant tells us the State's evidence was insufficient because it only provided a "reasonable guess" that the victim's death was a homicide; it lacked "independent evidence" as to precisely when and where the victim was supposedly killed; and it did not "conclusively place" Appellant at the site where the victim was likely murdered.

¶36 In resolving a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See Calvert v. State, 2022 OK CR 19517 P.3d 977Pullen v. State, 2016 OK CR 18387 P.3d 922McDaniel v. Brown, 558 U.S. 120, 131 (2010); Young v. State, 2000 OK CR 1712 P.3d 20Mason v. State, 2018 OK CR 37433 P.3d 1264Mitchell v. State, 2018 OK CR 24424 P.3d 677Shepard v. State, 2023 OK CR 15538 P.3d 518

¶37 Contrary to Appellant's narrow interpretation of the evidence in this case, the record evidence overwhelmingly supports the jury's guilty verdict. See Newman v. State, 2020 OK CR 14466 P.3d 574Davis v. State, 2004 OK CR 36103 P.3d 70See Matthews v. Workman, 577 F.3d 1175, 1185 (10th Cir. 2009) (citing Jackson, 443 U.S. at 319); 21 O.S.Supp.2012, § 701.7

¶38 The evidence, viewed in the light most favorable to the State, established that Appellant shot Holly in the head on January 20, 2017, sometime between 12:00 p.m. and 1:00 p.m., leaving her remains in a secluded wilderness area known as Cardinal Point. Holly left home for work around 7:15 a.m. wearing green scrubs. She clocked out of work at 11:56 a.m., entered Appellant's truck, and was never seen alive again. Both Holly's purse and her skeletal remains were later found in the Cardinal Point area. When her remains were finally discovered a year after her disappearance, fragments of her green scrubs were found as well. Cellular site data placed Appellant's phone in the vicinity of Cardinal Point less than 30 minutes after Holly left work in his truck and just days before her purse was found.

¶39 Further, after the murder, the defendant undertook a series of deliberate actions to conceal his involvement in Holly's disappearance. See Dodd v. State, 2004 OK CR 31100 P.3d 1017th. Taken together, these efforts constitute a calculated effort to mislead investigators, erase incriminating evidence, and demonstrate a consciousness of guilt.

¶40 Accepting all reasonable inferences and viewing the evidence in the light most favorable to the prosecution, sufficient evidence was presented at trial to support Appellant's conviction for first-degree murder. Proposition III is denied.

¶41 Proposition IV. Appellant complains in his final proposition that trial counsel was ineffective for failing to (1) retain a cell phone expert; (2) object to the cell phone location data on § 2403 grounds (see Proposition II); and (3) develop and present an alternative suspect argument.

¶42 To prevail on an ineffective assistance of counsel claim, a defendant must show both that counsel's performance was deficient, and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). See also Harrington v. Richter, 562 U.S. 86, 104-05 (2011) (discussing Strickland two-part test). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional conduct. Strickland, 466 U.S. at 689. Further, "[w]hen a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed." Malone v. State, 2013 OK CR 1293 P.3d 198Id. "The likelihood of a different result must be substantial, not just conceivable." Id., (quoting Harrington, 562 U.S. at 112).

¶43 Appellant fails to show Strickland prejudice with his first claim asserting trial counsel was ineffective for failing to present expert testimony to counter Hogue's expert testimony. Appellant's claim is based on pure speculation and is conclusory. See Knapper, 2020 OK CR 16Strickland test); Fulgham v. State, 2016 OK CR 30400 P.3d 775Stemple v. State, 2000 OK CR 4994 P.2d 61, the appellant failed to show "what the expert testimony would have been").

¶44 We dispose of his second claim on the ground of lack of prejudice as well. We found in Proposition II that Hogue's challenged cell phone location testimony was admissible because the danger of unfair prejudice did not outweigh the probative value of this evidence. See 12 O.S.2021, § 2403Strickland prejudice from defense counsel's failure to object to this evidence on § 2403 grounds. See Strickland, 466 U.S. at 694; Logan v. State, 2013 OK CR 2293 P.3d 969

¶45 Appellant's third and final ineffectiveness claim requires closer analysis. Appellant specifically asserts that trial counsel was ineffective for failing to pursue an alternative suspect theory implicating Holly's husband, Tommy Cantrell, as the perpetrator. According to Appellant, trial counsel fell short when he failed to draw out testimony from Cantrell that he had threatened to kill his ex-wife and leave her body at Cardinal Point. Appellant tells us that this evidence was "likely the difference between the jury finding Appellant guilty beyond a reasonable doubt or not."

¶46 Appellant's witness list included Cantrell's ex-wife, Kathy Lloyd, and said she would testify that Cantrell threatened to kill her and leave her body at Cardinal Point. The State filed a motion in limine to keep this evidence out, arguing it was improper character evidence. The trial court ruled that defense counsel could only question Cantrell about his alleged statements to Lloyd if the defense established a "quantum of evidence" identifying Cantrell as a third-party perpetrator. To do so, Judge Mills explained that some evidentiary foundation--beyond "suspicion or innuendo"--connecting Cantrell to Cardinal Point on January 20, 2017, was needed.

¶47 As the trial court recognized, a "quantum of evidence . . . is more than mere suspicion and innuendo[.]" Vasquez v. State, 2025 OK CR 1564 P.3d 880Gore v. State, 2005 OK CR 14119 P.3d 1268Gore, 2005 OK CR 14Id. The evidence must "connect[ ] the third party to the commission of the crime[.]" Id., 2005 OK CR 14Gore, 2005 OK CR 14

¶48 Despite Appellant's contention on appeal, no sufficient quantum of evidence connected Cantrell to his wife's murder. Appellant failed to offer any viable evidence of an overt act linking Cantrell to the murder of his wife. The evidence presented was speculative and attenuated. At best, the evidence relating to Cantrell merely suggested a theoretical possibility of another culprit--nothing more. A mere possibility of another culprit does not amount to the quantum of evidence needed to present third-party perpetrator evidence. Had defense counsel tried to question Cantrell or his ex-wife about the alleged threats, the State would have properly and successfully objected.

¶49 Because no such quantum of evidence existed, Appellant cannot show that defense counsel's performance was deficient due to his failure to pursue an alternative suspect theory implicating Cantrell. See Olvera v. State, 2024 OK CR 28559 P.3d 887Strickland's demanding standard for deficient performance is satisfied only by proof of unprofessional errors so serious that the attorney was not functioning as the 'counsel' guaranteed by the Sixth Amendment."). Nor can Appellant show Strickland prejudice given the overwhelming strength of the State's case.

¶50 Finding no Sixth Amendment violation under Strickland, Proposition IV is denied.

DECISION

¶51 The Judgment and Sentence of the district court is AFFIRMED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2026), the MANDATE is ORDERED issued upon delivery and filing of this decision.

AN APPEAL FROM 
THE DISTRICT COURT OF PITTSBURG COUNTY
THE HONORABLE TIMOTHY E. MILLS
ASSOCIATE DISTRICT JUDGE

 

 
 
 APPEARANCES AT TRIAL
 
 BRECKEN WAGNER
 BLAKE LYNCH
 WAGNER & LYNCH, PLLC.
 109 E. WASHINGTON
 MCALESTER, OK 74501
 COUNSEL FOR DEFENDANT
 APPEARANCES ON APPEAL
 
 SIMON CASSEL
 OKLA. INDIGENT DEFENSE SYSTEM
 111 N. PETERS, STE. 100
 NORMAN, OK 73069
 COUNSEL FOR APPELLANT
 
 
 
  

 HEATHER ANDERSON
 RICKY LUTZ
 ASST. ATTORNEYS GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR THE STATE
 
 
  

 GENTNER F. DRUMMOND
 OKLA. ATTORNEY GENERAL
 JAY T. SHANK
 ASST. ATTORNEY GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 
 

OPINION BY: HUDSON, J.
LUMPKIN, P.J.: CONCUR
MUSSEMAN, V.P.J.: CONCUR
LEWIS, J.: CONCUR
ROWLAND, J.: CONCUR

FOOTNOTES

th but the two had ridden motorcycles all day. About a week later, Pastor Jarrett spoke with Ford again after seeing a video clip on the news showing Holly leaving the hospital and getting into Appellant's green pickup. The pastor felt Ford had lied to him. Appellant was present when this second conversation took place and also spoke with Pastor Jarrett.

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Kumho Tire Co., Ltd. v. Patrick Carmichael et al., 526 U.S. 137 (1999), govern admissibility of scientific and other technical or specialized evidence. The Court in Daubert recognized a trial court's important responsibility, as well as its broad discretion, in assessing the admissibility of novel scientific evidence. The Court identified several factors which may aid trial judges in determining whether expert evidence is scientifically valid, and thus reliable enough, to be admissible under the permissive rules of evidence. See Title 12 O.S.2011, §§ 2702Daubert's principles to non-scientific but otherwise technical and specialized expert testimony in Kumho. We adopted the Daubert analysis in Taylor v. State, 1995 OK CR 10889 P.2d 319Kumho) to other types of expert testimony. Harris v. State, 2000 OK CR 2013 P.3d 489

             1. The testimony is based upon sufficient facts or data;

             2. The testimony is the product of reliable principles and methods; and

             3. The witness has applied the principles and methods reliably to the facts of the case.

Section 2702 has been amended effective September 1, 2025.

Bramlett that testimony about "cell phone tower records and geographic location data from cell phones" is not novel. Bramlett, 2018 OK CR 19

See Rule 3.5(A)(5), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2026).